WELLS, Inc., v. NATIONAL LABOR
RELATIONS BOARD.

NATIONAL LABOR RELATIONS BOARD
v. WELLS, Inc.

No. 11388.

Circuit Court of Appeals, Ninth Circuit.
June 17, 1947.

458

Louis H. Callister, of Salt Lake City, Utah, for petitioner.

Gerhard P. Van Arkel, Gen. Counsel, Morris P. Glushien, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and Mozart G. Ratner, Henry W. Lehmann and Robert Todd McKinlay, Attys., N.L.R.B., all of Washington, D. C., for respondent.

Before STEPHENS, HEALY, and BONE, Circuit Judges.

HEALY, Circuit Judge.

Two petitions are before us in this proceeding, one by the National Labor Relations Board to enforce an order, the other by Wells, Inc., the party affected, to set the order aside. The Board found an unfair practice in the discharge by Wells of a supervisory employee named Jack Benton, and it directed Benton's reinstatement. Wells contends that on the facts as found the discharge neither did nor could amount to a violation of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., and naturally it contests the reinstatement order.

The hearing before the Board was initiated by a complaint of the International Association of Machinists (herein sometimes called the Machinists or the Union) which claimed to be the authorized bargaining representative of the employees in one of Wells' shops. Wells operates an interstate trucking business with headquarters at Reno, Nevada, and maintains a shop there for the servicing and repair of its trucks. Benton had begun work in that shop as a mechanic in August 1942 but in April of 1943 he was promoted to the position of foreman. He had and exercised authority to hire and discharge the shop workers, a relatively small group consisting of mechanics, greasers, washers, and the like. Before becoming foreman he had joined the Machinists Union and continued to be one of its most active members. At the time of his discharge he was union steward and trustee and openly wore his button most of the time while at work. He at various times spoke to the rank and file employees about the Machinists Union and solicited a number of them to join it.

The Machinists had no bargaining agreement with Wells. The latter, however, had a contract with the International Brotherhood of Teamsters covering not only its drivers but certain employees of a repair shop which it maintained at Luning, Nevada, where it had a branch. The Teamsters objected to the recognition by Wells of the Machinists as bargaining representative for the greasers, washers, and others employed at Reno, claiming that these classifications "belonged" to the Teamsters. The Board found, on competent evidence that Wells anticipated a jurisdictional squabble if it recognized the Machinists as representative of its Reno shop workers; and there is evidence that Wells regarded

Benton as being responsible for its Reno employees becoming members of the Machinists and asking to be represented by it.

Efforts of the Machinists to organize the Reno shop and to obtain recognition from Wells came to a head in December of 1944. Authorization cards had been signed by five out of eight employees in what was stipulated at the Board hearing to be an appropriate bargaining unit, namely the group consisting of mechanics and mechanics helpers and apprentices.[1] On December 18, 1944, a petition signed by seven of these eight employees, as well as by others in the shop, was presented to Wells asking that the Machinists Union be designated as exclusive bargaining representative. The trial examiner found, on evidence that does not seem to be contested, that on December 22 Wells refused to recognize the Machinists or to bargain with them as the representative of the appropriate unit; and the examiner concluded that the refusal violated § 8(5) of the Act. For reasons presently to be mentioned the Board declined to accept the examiner's conclusion on that point.

Benton testified without substantial contradiction that about the end of December 1944 or early in January 1945 he spoke with Wells' superintendent, Divine, concerning his job as foreman, saying that he was paid only $25 a month more than some of the ordinary mechanics and that, unlike the latter, he received no extra compensation for his considerable overtime. Benton "wondered whether Divine could obtain a little more money" for him, or if that was not possible, he wondered if another foreman might be employed and he, Benton, given back his position as a mechanic. Divine said he thought matters could be arranged and advised Benton not to worry. At the end of January Divine told Benton that he was relieved of his duties as shop foreman, and, further, that it would not work out for Benton to become a rank and file mechanic in view of his former position as foreman. Benton remarked, "In other words, you mean that I am fired?"; to which Divine replied, "If you look at it that way, yes."

■ Apart from the implications of this incident, there were others from which one may infer an attitude of hostility on Wells' part toward the organizational activities of the Machinists. The Board believed that this attitude afforded the only rational explanation for Benton's discharge. It said: "That a discharge of an active adherent of a union under circumstances which suggest no motivation other than hostility to the union, operates as a warning to all employees of the danger attached to adherence to the union, hence generally discourages union membership, can not be denied." It thought the fact that Benton was a supervisory employee did not operate to relieve Wells of its obligation not to engage in discriminating conduct calculated to discourage membership in the Union.[2] The ultimate finding was that Benton's discharge was discriminatory within the purport of § 8(3) of the Act.

Wells appears to argue that it discharged Benton because, as a representative of management, his union activities compromised the neutrality of his employer and put the latter in the position of interfering with employee rights guaranteed by § 7 of the Act; hence his discharge was not only warranted but obligatory. Had this in truth been Wells' motive and had it seasonably made its position clear to the rank and file employees the argument would be conclusive. But the Board felt, and we think justifiably, that this claim of motivation is a palpable afterthought. Benton's activities were confessedly not assigned as a ground for his discharge at the time it occurred, nor were they mentioned as a motivating factor in Wells' answer filed in the proceeding.

■ Nor, under the special facts of the case, is motive for the discharge irrelevant, as Wells alternatively asserts. The prohibition of § 8(3), by its plain terms,

---

[1] Altogether, 11 of the shop employees had signed authorization cards, and apparently the 11 signed also the petition presented on December 18.

[2] That Benton was an "employee" as defined in the Act is settled by Packard Motor Car Co. v. NLRB, 67 S.Ct. 789, but the holding in that case is of no further aid here.

**460**

extends to any discriminatory discharge the purpose and manifest effect of which is to discourage employee membership in a labor organization. The existence of some justifiable ground for discharge is no defense if it was not the moving cause. Cf. N.L.R.B. v. Air Associates, Inc., 2 Cir., 121 F.2d 586; N.L.R.B. v. Skinner & Kennedy Stationery Co., 8 Cir., 113 F.2d 667. Consult further, Matter of Reliance Manufacturing Co., 60 N.L.R.B. 946; Matter of Vail Manufacturing Co., 61 N.L.R.B. 181; Matter of Climax Engineering Co., 66 N.L.R.B. No. 141.

■ As already intimated there is evidence, apart from the discharge of the foreman, supporting the cease and desist order and the collateral requirement of the posting of notices. But the propriety of the order requiring Benton's reinstatement to his former position appears to us highly dubious, to say the most for it. A prime aim of the National Labor Relations Act was to liberate the worker from all dominance by management in the exercise of his choice of a bargaining representative. Full liberty of choice in this respect is of the essence of the rights guaranteed. The problem here is whether, in light of Foreman Benton's active connection with the Machinists and his known history of championship of that union, his restoration to his former post of power and influence over the rank and file workers can justly be said to be a measure which will effectuate this policy.[3]

. ■ Ordinarily, to be sure, it is for the Board, with its specialized knowledge and experience in this field, to determine what steps will tend most effectually to correct the consequences of an unfair labor practice. But here the Board itself, in declining to accept the examiner's finding that Wells' refusal to recognize the Machinists constituted a violation of § 8(5) of the Act, has noted the incalculable nature of the foreman's influence upon the decision of his subordinates and the impossibility of gauging its extent.[4] It thought that Benton's discharge served as an object lesson to all employees of the danger of adhering to the Machinists; and this view we have accepted. But the cure proposed is in the nature of an object lesson of the possible perils of failing to adhere to the Machinists. The Board can not have it both ways. We are unimpressed by its claim that the enforced restoration of this foreman to his place of power will operate merely to erase the effect of Wells' unfair practices. We think, rather, as already said, that it would tend to perpetuate a condition of imbalance by the injection of an opposite and equally pernicious influence. True, Wells can again discharge its foreman if his unionization activities are resumed, but it can do so with assurance only if they are pursued in a fashion so flagrant and pronounced as to leave nothing to the imagination. Freedom of choice requires more than that. There are more subtle, less perceptible ways by which a supervisory employee, with authority to hire and discharge, to promote and demote, may influence choice as between competing unions, or as between union and no union.

The order is modified by excluding the requirement of Benton's reinstatement. With this modification a decree will be entered enforcing it. .

---

3 § 10(c).

4 The Board observed that this foreman, in full charge of the shop with the authority to hire and discharge, actively engaged in union activities as a steward and trustee and influenced subordinates to become members of the Machinists. It said that it was "impossible to determine the extent to which Foreman Benton's activities and solicitation were responsible for any employee's decision to join the Union, and hence for the Union's paper majority. Since the Union's majority was procured with the direct and open assistance of a supervisory employee, it cannot be said to represent the free and untrammeled will of the employees and hence cannot be recognized as valid majority."