[S. F. No. 18481. In Bank. Oct. 16, 1953.]

SAFEWAY STORES, INC. (a Corporation), Respondent, v. RETAIL CLERKS INTERNATIONAL ASSOCIATION et al., Appellants.

James F. Galliano, C. Paul Paduck, Benjamin Dreyfus and Alexander H. Schullman for Appellants.

Roland C. Davis, J. D. Burdick, Carroll, Davis & Freidenrich as Amici Curiae on behalf of Appellants.

Mitchell T. Neff, Willard S. Johnston, B. H. Parkinson, Jr., Orrick, Dahlquist, Neff & Herrington, John B. Rosson, Brown, Rosson & Berry and Edward E. Mitchell for Respondent.

Iddings, Jeffrey, Weisman & Rogers and Pillsbury, Madison & Sutro as Amici Curiae on behalf of Respondent.

SHENK, J.—This is an action to enjoin strike activities of the defendant unions. A preliminary injunction issued. The defendants have appealed.

The controversy leading to the commencement of the action arose after the enactment of the Labor Management Relations Act in 1947 (61 Stats. 136, § 101), amending the National Labor Relations Act of 1935 (29 U.S.C.A. §§ 151-167), and removing supervisors from the classification of employees as defined in the act. The problem concerns the effect of the Labor Management Relations Act on the right of the defendant local unions to recognition as the bargaining agents for the plaintiff's local store managers for the purpose of coercing the inclusion of store managers in the retail clerks' collective bargaining contract with the employer.

The plaintiff, herein referred to as Safeway, is a corporation engaged in the business of owning and operating retail food stores throughout the United States. For the purposes of this case it is engaged in interstate commerce. The defendants are the Retail Clerks International Association, an unincorporated association, the affiliated state association, and the local clerks' unions of Alameda and Contra Costa counties in this state.

Seventy-six of Safeway's stores are located in the counties mentioned. In each store a manager and from four to 23 clerks and butchers are employed. Each store stocks some 1,800 different food and household items and daily sales run from $700 to $3,000. The clerks belong to their retail clerks' local unions. The butchers belong to their separate union. In addition other employees, such as deliverymen, belong to their own union. Each store is separate geographically from the others and each has its individual store manager.

Beginning in 1937 and until September 19, 1949, clerks and store managers were members of the defendant local unions under current labor contracts. It is assumed that prior to the present controversy the unions were the certified bargaining representatives of the store managers and clerks under the National Labor Relations Act. Before the expira-

tion of the last contract on the above date in 1949 certain wage increases were demanded. During the course of the negotiations the plaintiff announced that local store managers would no longer be included in the labor contract. On September 19, 1949, one of the defendant local unions instituted a strike and began picketing. Wage increases for store managers and clerks were settled on October 19th and were put into effect by Safeway on October 26th. Upon the refusal of Safeway to include store managers in the contract or to recognize the clerks' unions as the representatives of the store managers, the other union then struck. The strike and picketing continued until the commencement of this action in November, 1949. A hearing on the order to show cause was had on the verified complaint, numerous affidavits, and oral testimony. It consumed 76 court days and resulted in the issuance of the preliminary injunction on March 22, 1950.

As material here the trial court's order enjoined the defendants from engaging in concerted activities to induce or compel the plaintiff to require union membership of its store managers in the local unions or to bargain to that end with the store managers or with the unions on their behalf. These provisions of the order are based on the facts disclosed at the hearing and the conclusions of the court drawn therefrom that the store managers are supervisors within the meaning of the Labor Management Relations Act of 1947. The propriety of that conclusion and of the action of the trial court on the record are the questions presented.

There are, of course, no findings as such at this stage of the proceeding. They follow appropriately after the trial of the action. The facts, for present purposes, are disclosed by the allegations of the verified complaint, the averments of numerous affidavits, other documentary evidence, and the oral testimony. It was for the trial court to resolve any conflicts in the evidence.

In the opinion of the trial court, which has been made a part of the record (rule 5(a) of Rules on Appeal), it is stated: (1) that the store managers (referred to generally by the plaintiff as location managers, and by the defendants as managing clerks), are supervisory employees who act as agents of management entrusted with the formulation and execution on behalf of management of substantial matters involving judgment and policy; (2) that no issue was presented concerning the wages, hours or working conditions of the clerks or the store managers; (3) that the object of the

strike was to compel Safeway to bargain and contract with the clerks' union concerning membership of its store managers in the defendant local unions; (4) that the strike was not a jurisdictional strike as contended by Safeway and as denounced by section 1118 of the Labor Code of this state; (5) that the bylaws of the local unions provide that "only members not having the right to hire or fire shall be eligible to, or shall hold, office"; that "any member who is guilty of improper conduct . . . shall be fined, suspended or expelled"; (6) that the executive boards of the two local unions are vested with the "power to . . . discipline any member by fine, removal from employment or other penalty . . . for conduct which tends to undermine the purposes for which the union is formed"; (7) that the constitution of the Retail Clerks' International Association contains substantially the same provisions and in addition provides that "it shall be the duty of members of every local union individually and collectively to do all in their power to advance the cause of organized labor . . ."; (8) that each store manager has the final decision as to whether clerks shall be employed to work or shall continue to work in the store of which he is manager; (9) that violence, intimidation and coercion on the part of pickets of defendant local unions have occurred in such a way as to indicate their recurrence unless restrained by an appropriate order; (10) that the purpose of the picketing is to further an objective which is contrary to the public policy of the state and therefore unlawful; and (11) that the plaintiff is suffering serious damage as a result of the defendants' activities. There is an abundance of evidence to support the foregoing statements of fact and conclusions.

It is contended by the defendants that the trial court had no jurisdiction to act on the subject matter of the complaint and that exclusive jurisdiction was vested in the National Labor Relations Board. The history of the federal legislation on the subject may be resorted to in considering the effect of the changes in the law. It may be assumed that before the enactments of 1947 the subject matter of the controversy was within the exclusive jurisdiction of the National Labor Relations Board. But the changes compel an opposite conclusion.

Section 2(3) of the act of 1947 excludes from the definition of "employee" "any individual employed as a supervisor." Section 2(11) states that the "term 'supervisor' means any individual having authority, in the interest of the employer,

to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.''

The evidence is overwhelming to the effect that the local store managers have authority in the interest of their employer to direct the activities of employees under their supervision, to effectively make recommendations in disciplinary matters and to hire and discharge the clerks. Both sides concede that store managers perform the duties of clerks when necessary or in their spare time. The record, however, supports the conclusion that the store managers act as agents of management in substantial and important matters of judgment and policy. The inclusion of detailed evidentiary matter in this respect is unnecessary in view of decisions of the National Labor Relations Board in similar cases that such store managers are supervisors. (*National Tea Co.*, 89 N.L.R.B. No. 148, N.L.R.B. Decisions (CCH), par. 9922, 1950; *Re Safeway Stores, Inc.*, 59 N.L.R.B. 936, 938 (1944).) In November 1949, in related cases involving Safeway in neighboring counties the National Labor Relations Board ordered the clerks' union not to bargain collectively with Safeway by demanding as a condition the inclusion of store managers. That order implies a holding that the store managers are supervisors. In *Ohio Power Co.* v. *N.L.R.B.* (1949), 176 F.2d 385, 388, it was said that § 2 (11) covers any individual having authority responsibly to direct; that it ''does not require the exercise of the power described for all or any definite part of the employee's time. It is the existence of the power which determines the classification.'' In that case the court ordered that the board's certification of representatives entered prior to the effective date of the Labor Management Relations Act be set aside to the extent that supervisory employees involved were included in the unit, and that the certification be amended to exclude them from the unit.

 By the exclusion of supervisory employees and the regulation of their collective bargaining rights from the federal act the field as to them was left open to state control. (*Allen-Bradley Local* v. *Wisconsin Emp. Relations Board*, 315 U.S. 740 [62 S.Ct. 820, 86 L.Ed. 1154] ; cf. *Gerry of California* v. *Superior Court*, 32 Cal.2d 119 [194 P.2d 689].)

 Therefore, the contention that the state court has no juris-

diction until the National Labor Relations Board in the first instance determines that store managers are supervisors is without merit; and since the state court can act, it has the jurisdiction to determine the facts upon which its jurisdiction depends. (*Rescue Army* v. *Municipal Court,* 28 Cal.2d 460, 464 [171 P.2d 8]; appeal dismissed, 331 U.S. 549 [67 S.Ct. 1409, 91 L.Ed. 1666].) In the present case the jurisdictional fact that store managers are supervisors has been determined with evidentiary support adversely to the defendants' contention.

The question then is as to the rights of the clerks' unions under state law to engage in concerted activities against Safeway for the purpose of requiring store managers to be included in the labor contract of the clerks.

The federal amendatory act neither enlarges nor limits the existing fundamental rights of supervisors. What it does is to unclassify supervisors as employees under federal and state acts regulating the exercise of employees' collective bargaining rights, coupled with the inhibition against compulsions on the employer engaged in interstate commerce to include supervisors as employees for the purpose of such acts.

The decisional and other authorities define existing fundamental labor rights. ■ The right of self-organization and of selection of a bargaining representative are rights which exist independently of labor relations acts. The existing right includes union organization for the conduct of collective bargaining and the traditional peaceful strike for higher wages. (See Torts, Restatement, § 784.) It was characterized and recognized as a fundamental right long before it was protected under the National Labor Relations Act and similar state acts. (*International Union* v. *Wisconsin Emp. Relations Board,* 336 U.S. 245, 259 [69 S.Ct. 516, 93 L.Ed. 651]; *National Labor Relations Board* v. *Jones & Laughlin Steel Corp.,* 301 U.S. 1, 33 [57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352]; see, also, *International Union* v. *O'Brien,* 339 U.S. 454, 457 [70 S.Ct. 781, 94 L.Ed. 978].) It was the regulation of this fundamental right of the labor supervisory personnel formerly included within the federal act that the 1947 amendatory provisions left to the states for separate classification and regulation.

■ It is undisputed that concerted union activity for an objective which is not reasonably related to any legitimate interest of organized labor will be enjoined. It was said in *James* v. *Marinship Corp.,* 25 Cal.2d 721 at page 728 [155

574

P.2d 329, 160 A.L.R. 900]; "It should be recognized at the outset that a union may use the various forms of concerted action . . . to enforce an objective that is reasonably related to any legitimate interest of organized labor . . . (citing cases). It is equally well settled that the object of concerted labor activity must be proper and that it must be sought by lawful means, otherwise the persons injured by such activity may obtain damages or injunctive relief." In that case the plaintiff employees successfully sought the exercise of the equity powers of the court to control the activities of fellow employees and management contrary to the rights of the plaintiffs. Those rights were not protected or controlled by any statutory regulation. So here the equity jurisdiction of the court was invoked by the plaintiff to be protected against unjustifiable coercion on the part of one group of its employees concerning a matter which also was not the subject of any statutory regulation or control and was contrary to the rights of the plaintiff.

The trial court concluded that the union activity was contrary to public policy and therefore unlawful. One of the questions presented is whether it has appropriately done so. ▮ It is true that questions of public policy are primarily for the legislative department to determine. But it is also true that when neither the Constitution nor the Legislature has spoken on the subject the courts may make the declaration.

In cases without number the state courts have declared contracts, transactions and activities of individuals, associations and corporations to be contrary to public policy where their legislative departments have not spoken on the subject.

One of the latest restatements of the rule is by the Supreme Court of the United States in *Building Service etc. Union* v. *Gazzam* (1949), 339 U.S. 532 [70 S.Ct. 784, 94 L.Ed. 1045], where it was said at page 536: "The public policy of any state is to be found in its constitution, acts of the legislature, and decisions of its courts. 'Primarily it is for the lawmakers to determine the public policy of the state.' *Twin City Pipe Line Co.* v. *Harding Glass Co.*, 283 U.S. 353, 357 [51 S.Ct. 476, 75 L.Ed. 1112]."

This court has within recent years declared the public policy of the state within the particular field here involved. (*James* v. *Marinship Corp., supra* (1944), 25 Cal.2d 721; *Hughes* v. *Superior Court* (1948), 32 Cal.2d 850 [198 P.2d 885], affirmed 339 U.S. 460 [70 S.Ct. 718, 94 L.Ed. 985].)

■ The term "public policy" is inherently not subject to precise definition. In *Maryland Casualty Co.* v. *Fidelity & Casualty Co.*, 71 Cal.App. 492, the court stated at page 497 [236 P. 210] : "The question, what is public policy in a given case, is as broad as the question of what is fraud." Also in *Noble* v. *Palo Alto*, 89 Cal.App. 47, the court said at pp. 50-51 [264 P. 529] : "Public policy is a vague expression, and few cases can arise in which its application may not be disputed. Mr. Story, in his work on Contracts (§ 546), says: 'It has never been defined by the courts, but has been left loose and free of definition in the same manner as fraud.' By 'public policy' is intended that principle of law which holds that no citizen can lawfully do that which has a tendency to be injurious to the public or against the public good. . . . Public Policy means . . . anything which tends to undermine that sense of security for individual rights, whether of personal liberty or private property, which any citizen ought to feel is against public policy. . . ."

■ Since on this record store managers are agents of management, when so acting they owe undivided loyalty to their principal. As members of the defendant unions they would under union rules be in duty bound to advance the cause of the community of interest of store managers and clerks in any dispute or disagreement with their principal. They would be under constant apprehension of the penalties under union rules, such as fines, suspension, or expulsion. It is eminently proper that management supervisors, the store managers in this case, be kept free from the divided loyalty that would be engendered by compulsory membership in the defendant local unions. Under the law an employer may not demand that his representatives sit in the inner councils of labor and thus be placed in the position of exerting his influence in directing labor's policies and activities. If such an objective were recognized and were accomplished collective bargaining would be in confusion and indeed futile. By the same token an employee union may not insist that a representative of the employer be required to participate in its deliberations under union rules and thus divide his loyalty.

■ Confronted with the responsibility of declaration where as here there is no constitutional or legislative guide on the subject we hold that the trial court was correct in deciding that the coercion sought to be exercised by the defendants under the circumstances of this case was not reasonably related to any legitimate interest of organized labor;

that the activities of the defendants were not in the further-
ance of any proper labor objective, and that as a matter of
sound public policy were enjoinable within the equity juris-
diction of the court.

The judgment is affirmed.

Edmonds, J., Schauer, J., and Spence, J., concurred.

CARTER, J.—I dissent.

The majority holds that the federal law (Labor Manage-
ment Relations Act) has no bearing on this case and that
the question is one of state law. With that I agree.

The sole question, as put by the majority opinion, is
whether the public policy of this state forbids the representa-
tion in collective bargaining of supervisory employees by a
union composed of the rank and file employees. The majority
opinion holds that public policy does prohibit such representa-
tion, and, as a corollary thereof, that concerted activity by
the union to compel such representation is for an unlawful
object and therefore enjoinable. I am not concerned with
the latter question because I do not believe such representa-
tion is against the public policy of this state. Indeed, the
public policy as expressed by the Legislature is directly to
the contrary. The statute states: ''[T]he public policy of
this State is declared as follows:

''Negotiation of terms and conditions of labor should re-
sult from voluntary agreement between employer and em-
ployees. Governmental authority has permitted and en-
couraged employers to organize in the corporate and other
forms of capital control. In dealing with such employers, the
individual unorganized worker is helpless to exercise actual
liberty of contract and to protect his freedom of labor, and
thereby to obtain acceptable terms and conditions of employ-
ment. Therefore it is necessary that the individual workman
have *full freedom of association,* self-organization, and *desig-
nation of representatives of his own choosing,* to negotiate
the terms and conditions of his employment, and that he shall
be free from the interference, restraint, or coercion of em-
ployers of labor, or their agents, in the designation of such
representatives or in self-organization or in other concerted
activities for the purpose of collective bargaining or other
mutual aid or protection.'' (Emphasis added; Lab. Code,
§ 923.) Thus an employee shall have the right to bargain
collectively through a representative of his own choosing.

Here the rank and file union is the representative chosen by the store managers and to hold that they may not choose such representative is contrary to section 923, *supra*. There is no qualification on the term "employee" in section 923. Therefore it embraces supervisory as well as nonsupervisory employees. It has been held that a mine superintendent is an employee within the meaning of the labor laws (*Davis* v. *Morris*, 37 Cal.App.2d 269 [99 P.2d 345]), and it has been held repeatedly that supervisory employees came within the term "employees" under the National Labor Relations Act until it was amended in 1947 to expressly exclude them from the term. (*L. A. Young Spring & Wire Corp.* v. *National Labor Relations Board*, 163 F.2d 905; *National Labor Relations Board* v. *Swift & Co.*, 162 F.2d 575; *Wells, Inc.* v. *National Labor Relations Board*, 162 F.2d 457; *Packard Motor Car Co.* v. *National Labor Relations Board*, 330 U.S. 485 [67 S.Ct. 789, 91 L.Ed. 1040].) In the Packard case, it was held that supervisory employees were within the term "employee" used in the National Labor Relations Act and hence entitled to the benefits of the act, that is, to have the employer bargain collectively with an association formed to represent them in such bargaining, the court stating: "The point that these foremen are employees both in the most technical sense at common law as well as in common acceptance of the term, is too obvious to be labored. The Company, however, turns to the Act's definition of employer, which it contends reads foremen out of the employee class and into the class of employers. (Section 2(2) reads: 'The term "employer" includes any person acting in the interest of an employer, directly or indirectly. . . .' 49 Stat. 450. The context of the Act, we think, *leaves no room for a construction of this section to deny the organizational privilege to employees because they act in the interest of an employer. Every employee, from the very fact of employment in the master's business, is required to act in his interest. He owes to the employer faithful performance of service in his interest, the protection of the employer's property in his custody or control, and all employees may, as to third parties, act in the interests of the employer to such an extent that he is liable for their wrongful acts. . . ."*

"*Even those who act for the employer in some matters, including the service of standing between management and manual labor, still have interests of their own as employees.*

*Though the foreman is the faithful representative of the employer in maintaining a production schedule, his interest properly may be adverse to that of the employer when it comes to fixing his own wages, hours, seniority rights or working conditions. He does not lose his right to serve himself in these respects because he serves his master in others. . . .*

"*The company's argument is really addressed to the undesirability of permitting foremen to organize.* It wants selfless representatives of its interest. It fears that if foremen combine to bargain advantages for themselves, they will sometimes be governed by interests of their own or *of their fellow foremen,* rather than by the company's interest. There is nothing new in this argument. It is rooted in the *misconception that because the employer has the right to wholehearted loyalty in the performance of the contract of employment, the employee does not have the right to protect his independent and adverse interest in the terms of the contract itself and the conditions of work.* But the effect of the National Labor Relations Act is otherwise, and it is for Congress, not for us, to create exceptions or qualifications at odds with its **plain terms.**

"Moreover, *the company concedes that foremen have a right to organize. What it denies is that the statute compels it to recognize the union.* In other words, it wants to be free to fight the foremen's union in the way that companies fought other unions before the Labor Act. But there is nothing in the Act which indicates that Congress intended to deny its benefits to foremen as employees, if they choose to believe that their interests as employees would be better served by organization than by individual competition. . . .

"It is also urged upon us most seriously that unionization of foremen is from many points bad industrial policy, that *it puts the union foreman in the position of serving two masters, divides his loyalty and makes generally for bad relations between management and labor. However we might appraise the force of these arguments as a policy matter, we are not authorized to base decision of a question of law upon them. They concern the wisdom of the legislation; they cannot alter the meaning of otherwise plain provisions.*" (Emphasis added; *Packard Motor Car Co.* v. *National Labor Relations Board,* 330 U.S. 485, 488-493 [67 S.Ct. 789, 91 L.Ed. 1040].) Likewise in the present case, section 923, *supra,* by the use of the term "employee" without qualification includes supervisory employees, namely, the store managers, and the Legis-

lature has declared that such employees shall have the right to bargain collectively with a representative of their own choosing. Hence they may choose the rank and file union as their representative. The Legislature has so declared and this court is not authorized to declare a contrary policy as does the majority here.

It may be suggested that the managers are entitled to form their own union separate from the rank and file union and have it represent them in bargaining, but they cannot, as here, have the rank and file union as their representative. The majority opinion does not discuss this question but the clear implication is that it would be unlawful for a union of managers to bring concerted action to compel the employer to bargain with it. In the first place, there is no such limitation in section 923, *supra*. It is left solely to the supervisory employees to decide who shall represent them and that includes either a managers' union or rank and file union.

In regard to a distinction, if any, between the right to bargain through a managers' union or a rank and file union, the majority opinion in summarizing its holding, states: "Since on this record store managers are agents of management when so acting they owe undivided loyalty to their principal. As members of the defendant unions they would under union rules be in duty bound to advance the cause of the community of interest of store managers and clerks in any dispute or disagreement with their principal. They would be under constant apprehension of the penalties under union rules, such as fines, suspension, or expulsion. It is eminently proper that management supervisors, the store managers in this case, be kept free from the divided loyalty that would be engendered by *compulsory membership* in the defendant local unions. Under the law an employer may not demand that his representatives sit in the inner councils of labor and thus be placed in the position of exerting his influence in directing labor's policies and activities. If such an objective were recognized and were accomplished collective bargaining would be in confusion and indeed futile." The same arguments there made would apply regardless of whether a rank and file union or managers' union was the representative of the managers because the latter union would have its rules and threats of suspension for any member who was not loyal to the union's cause of obtaining the best terms of employment possible for its members. Its interests would conflict with the employer's interests the same as the interests of a

rank and file union. It should be observed that the majority opinion refers to the ''compulsory membership'' of the managers in the rank and file union. As far as appears, the managers are not being compelled to belong to the rank and file union and have it as their representative. They are willing and want to join such union and have such representation.

This brings us to the question of whether there is or should be any public policy against the formation and use, as a bargaining representative, of a union by the managers alone. From what I have stated above, it clearly appears that the policy, as stated by the Legislature (Lab. Code, § 923, *supra*), authorizes such representation. Aside from the Legislature's declaration, however, it should be clear that the policy favors such representation. The soundness of that proposition is demonstrated by the decision in *Packard Motor Car Co.* v. *Labor Board*, 330 U.S. 485, quoted *supra*. Moreover, such representation is not new in the law. In the newspaper and job printing field, foremen have been members of the rank and file unions since 1889. (See 55 Yale L.J. 772.) The same is true in other industries such as building trades, metal trades, and railroads. (Collective Bargaining by Foremen, 12 Labor Relations Reporter, 421, May, 1943, Bureau of National Affairs.) In *National Labor Relations Board* v. *Edward G. Budd Mfg. Co.*, 169 F.2d 571, 577, cert. denied 335 U.S. 908 [69 S.Ct. 411, 93 L.Ed. 441], the court in discussing the claim that the Labor Management Relations Act (1947 amendment) was unconstitutional as to foremen because they were excluded from its protection, held the act constitutional but said: ''The right of employees to form labor organizations and to bargain collectively through representatives of their own choosing with employers has long been recognized. *N.L.R.B.* v. *Jones & Laughlin Steel Corporation*, 301 U.S. 1, 33, 34, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352.''

I would, therefore, reverse the judgment.

Traynor, J., concurred.

Appellants' petition for a rehearing was denied November 12, 1953. Gibson, C. J., Carter, J., and Traynor, J., were of the opinion that the petition should be granted.