[Civ. No. 47077. Second Dist., Div. Three. Apr. 27, 1976.]

RAY KINNER, Cross-complainant and Appellant, v.
WORLD SAVINGS AND LOAN ASSOCIATION,
Cross-defendant and Respondent.

COUNSEL

Robert M. Aran for Cross-complainant and Appellant.

McKenna & Fitting, Edward Lasker, Aaron M. Peck, I. Bruce Speiser and Alan Holmberg for Cross-defendant and Respondent.

**OPINION**

**ALLPORT, J.**—In a complaint to foreclose a mechanic's lien and for damages Ed's Electric, Inc., alleged that at the special instance and request of defendant Ray Kinner it furnished labor and materials of the reasonable value of $39,063.72 for installation of electrical fixtures in a 27-unit apartment house on account of which it had been paid $31,492.43, leaving an unpaid balance of $7,571.29 plus costs and interest.

In an amended cross-complaint against World Savings & Loan Association Kinner sought contribution and/or indemnification (second cause of action); compensatory and punitive damages for intentional, wilful, grossly negligent and wrongful interference with business expectancy (fifth cause of action); unjust enrichment (sixth cause of action); damages for negligence (seventh cause of action); and damages

for breach of implied covenant of fair dealing (eighth cause of action), together with interest and attorney's fees.

A general demurrer to the amended cross-complaint was sustained and, upon being advised that no further facts could be pleaded in support thereof, an order was made dismissing the cross-complaint as to cross-defendant World. Kinner appeals from the order and judgment of partial dismissal entered pursuant to Code of Civil Procedure section 581, subdivision 3. The appeal lies. (Code Civ. Proc., §§ 581d, 904.1, subd. (a).)

*Facts*

The amended cross-complaint, insofar as it involves World, basically alleges that on or about June 14, 1973, World made a loan to Kinner and others in the principal gross sum of $375,000 for the sole purpose of construction of a 27-unit apartment house at 15825 Saticoy Street, Van Nuys, California. The loan was evidenced by a note secured by a first deed of trust encumbering the subject real property and the net sum available for construction purposes after deduction of percentage or points for making the loan and other fees and charges was approximately $335,000. The gravamen of the action, although pursued on varying legal theories in the five separate causes of action, is that World, as a construction lender, owed a duty or obligation to Kinner, as an owner borrower, to lend to Kinner a fund sufficient to enable Kinner to complete the proposed construction project or not to have made the loan at all.

It is specifically alleged that World made the loan to Kinner for the sole purpose of providing adequate funds to enable him to fully complete the project. At the time the loan was made World was a sophisticated experienced construction lender, aware not only of the sum necessary to complete the project, but also aware of the then current economic conditions and with superior knowledge of the effect of inflation upon construction costs. World knew that the amount of the loan would be inadequate for the purpose once there was deducted therefrom lender's fees and charges but that it nevertheless negligently and wilfully, contrary to the custom of lenders such as World and in violation of an implied covenant of fair dealing deducted such charges from the gross amount rendering the net proceeds of the loan inadequate to complete the project legally entitling Kinner to contribution, indemnification, damages, attorney's fees and costs.

*Issue*

██ Concisely stated the sole issue before us is whether the amended cross-complaint states facts sufficient to constitute a cause of action against a general demurrer. (Code Civ. Proc., § 430.10, subd. (e).)

*Discussion*

While conceding a lack of legal precedent establishing the duty or obligation asserted against World, Kinner nevertheless suggests that the "modern trend of the law" dictates the creation of duties and obligations in this field heretofore unrecognized in law or equity. We are asked to "succintly [*sic*] analyze the modern trend of the law and to find [and declare] that . . . based upon sound legal and economic principles" an institutional construction lender owes a duty or obligation to its immediate borrower to lend funds sufficient to complete the proposed construction project or not to lend at all.

██ At the outset we note that it is well settled that a general demurrer admits the truth of all material factual allegations in the cross-complaint; that the question of cross-complainant's ability to prove these allegations, or the possible difficulty in making such proof does not concern the reviewing court; and that cross-complainant need only plead facts showing that he may be entitled to some relief. (*Alcorn* v. *Anbro Engineering, Inc.,* 2 Cal.3d 493, 496 [86 Cal.Rptr. 88, 468 P.2d 216].)

██ Our examination of the law has failed to disclose to us any "modern trend" remotely justifying a declaration by this court, under the guise of public policy or otherwise, of a duty or obligation on the part of a simple construction lender to its borrower such as is sought in this case.

In considering the concept "public policy" we find guidance in *Safeway Stores* v. *Retail Clerks etc. Assn.,* 41 Cal.2d 567, 574-575 [261 P.2d 721], wherein our Supreme Court said:

"It is true that questions of public policy are primarily for the legislative department to determine. But it is also true that when neither the Constitution nor the Legislature has spoken on the subject the courts may make the declaration.

"In cases without number the state courts have declared contracts, transactions and activities of individuals, associations and corporations to

be contrary to public policy where their legislative departments have not spoken on the subject.

"One of the latest restatements of the rule is by the Supreme Court of the United States in *Building Service etc. Union* v. *Gazzam* (1949), 339 U.S. 532 [70 S.Ct. 784, 94 L.Ed. 1045], where it was said at page 536: 'The public policy of any state is to be found in its constitution, acts of the legislature, and decisions of its courts. "Primarily it is for the lawmakers to determine the public policy of the state." *Twin City Pipe Line Co.* v. *Harding Glass Co.,* 283 U.S. 353, 357 [51 S.Ct. 476, 75 L.Ed. 1112].' . . .

"The term 'public policy' is inherently not subject to precise definition. In *Maryland Casualty Co.* v. *Fidelity & Casualty Co.,* 71 Cal.App. 492, the court stated at page 497 [236 P. 210]: 'The question, what is public policy in a given case, is as broad as the question of what is fraud.' Also in *Noble* v. *Palo Alto,* 89 Cal.App. 47, the court said at pp. 50-51 [264 P. 529]: 'Public policy is a vague expression, and few cases can arise in which its application may not be disputed. Mr. Story, in his work on Contracts (§ 546), says: "It has never been defined by the courts, but has been left loose and free of definition in the same manner as fraud." By "public policy" is intended that principle of law which holds that no citizen can lawfully do that which has a tendency to be injurious to the public or against the public good. . . . Public Policy means . . . anything which tends to undermine that sense of security for individual rights, whether of personal liberty or private property, which any citizen ought to feel is against public policy. . . .' "

Applying these principles to the situation at bench, we are unable to comprehend that in making the loan in question World did or failed to do anything "which has a tendency to be injurious to the public or against the public good" so as to be in violation of public policy. The facts disclose that insofar as this transaction is concerned World did nothing more than lend money. Upon satisfying itself that the proposed construction project provided adequate security, a loan, satisfactory to the owner-builder, was negotiated. World's participation in the transaction was that of a simple construction lender. Its fees and charges were collected only for use by borrower of the money advanced. It did not stand to gain otherwise by actively participating in the enterprise. No third party was involved. Presumably the borrower was fully aware of the total amount needed to complete the project, the gross and net amounts of the proposed loan and of his own independent financial ability to meet any deficiency. Under the circumstances we fail to

envisage the existence of any applicable public policy which would impose upon one making such a loan the unilateral, unrealistic and burdensome duty or obligation suggested in this case.

Furthermore we perceive of no so-called modern trend of the law persuasive or compelling of the imposition of such a duty or obligation. In urging such, reliance is placed upon *Connor* v. *Great Western Sav. & Loan Assn.*, 69 Cal.2d 850 [73 Cal.Rptr. 369, 447 P.2d 609, 39 A.L.R.3d 224], wherein our Supreme Court held an institutional construction lender liable to the buyers of homes financed with its funds for damages resulting from soil instability and inadequate foundation construction. After holding that no joint venture existed[1] even though the lender and borrower each received substantial payments from the home buyers because neither had an interest in the payments received by the other, it was determined that, under the basic tests set forth in *Biakanja* v. *Irving*, 49 Cal.2d 647, 650 [320 P.2d 16, 65 A.L.R.2d 1358], the lender Great Western nevertheless had a duty to prevent the construction and sale of seriously defective homes to third parties. In *Connor* it was established that Great Western was more than a simple lender. Its interest in the project was not only that of a construction lender but it retained and exercised substantial control over the course the development of the tract would take. It was determined that in the exercise of such control such a lender should have discovered that the plans were inadequate and insisted on their being corrected during the course of construction. The factual distinction between *Connor* and the case at bench is readily apparent rendering the rule of *Connor* inapposite. Furthermore the effect to be given *Connor*, which was decided December 12, 1968, was short lived. By Statutes 1969, chapter 1584, section 1, page 3222, the Legislature enacted Civil Code section 3434 effective November 10, 1969, limiting if not emasculating the effect of its holding.

Section 3434 provides: "A lender who makes a loan of money, the proceeds of which are used or may be used by the borrower to finance the design, manufacture, construction, repair, modification or improvement of real or personal property for sale or lease to others, shall not be held liable to third persons for any loss or damage occasioned by any defect in the real or personal property so designed, manufactured, constructed, repaired, modified or improved or for any loss or damage resulting from the failure of the borrower to use due care in the design,

---

[1]In the instant case an attempt is made to allege that World and Kinner were joint venturers.

manufacture, construction, repair, modification or improvement of such real or personal property, unless such loss or damage is a result of an act of the lender outside the scope of the activities of a lender of money or unless the lender has been a party to misrepresentations with respect to such real or personal property."

In *Fox & Carskadon Financial Corp.* v. *San Francisco Fed. Sav. & Loan Assn.,* 52 Cal.App.3d 484 [125 Cal.Rptr. 549], the court of appeal upheld the granting of a summary judgment in favor of the construction lender holding that the lender was under no duty to third parties under the following situation, the court saying at page 486:

"Fox & Carskadon Financial Corporation entered into an agreement with one Hyman Weisel (not a party to this action) in which Weisel agreed to sell to El Camino Real Associates, a limited partnership to be formed by Fox & Carskadon, an apartment project to be constructed by Weisel. The total purchase price for the project was $2,375,000. Weisel applied to San Francisco Federal for a construction loan of $1,800,000. In June 1969, the directors' loan committee meeting of San Francisco Federal approved the loan. At the time the respondent approved the loan it knew of the agreement between Weisel and Fox & Carskadon. In making the loan, San Francisco Federal relied on information it possessed with regards to Weisel's financial condition from prior business dealings together.

"In late December 1969, it became apparent to San Francisco Federal from information obtained from Weisel that he was experiencing financial difficulty and lack of cash to carry on his operations. In January 1970, Weisel notified San Francisco Federal, Fox and El Camino that he was preparing to file petitions to have himself and a number of his wholly owned corporations adjudicated bankrupt. Such petitions were filed in January 1970. San Francisco Federal proceeded to foreclose under its deed of trust and at the trustees' sale San Francisco Federal purchased the property for $1,700,000. At the time of the sale, the total loan demand, including principal, interest, foreclosure fees and costs was substantially in excess of $1,700,000. Thus, as a result of the sale, Fox and El Camino Real Associates lost their equity in the apartments."

After distinguishing *Connor, supra,* the court said at pages 487-488:

"This position is supported by the fact that immediately after the *Connor* decision, the Legislature enacted Civil Code section 3434. This

statute delineates when a construction lender may be held liable for the failure of the borrower.

"Appellants argue that Civil Code section 3434 was to control a lender's liability for physical defects only. It is the intent of the statute as we read it to define when a duty of care is placed on a financial institution for failures on the part of borrowers. To grant plaintiffs relief on a negligence theory would be to expand lender liability beyond the Legislature's implied limit." (Fn. omitted.)

Since a conventional lender has only a limited duty to third parties, we see no basis for creating in favor of an immediate borrower a duty insuring the adequacy of a construction loan.

In rationalizing this matter we find the language in *Bradler* v. *Craig,* 274 Cal.App.2d 466, at pages 472-476 [79 Cal.Rptr. 401], persuasive of our decision herein. In *Bradler* the purchaser of a home sued the construction lender Santa Barbara Savings and Loan Association for damages resulting from inadequate foundation construction. A general demurrer to the complaint was sustained and the cause dismissed. In affirming the judgment of dismissal this court said at pages 474-476:

"In the instant case plaintiffs seek to hold Santa Barbara liable in negligence on the following allegations: Santa Barbara loaned money to an unidentified person to purchase five lots and build houses thereon for sale to the public; Craig constructed plaintiffs' house on one of the lots; Santa Barbara was the construction money lender; Santa Barbara 'approved the plans and specifications, and construction methods used and supervised and inspected and approved the finished structure' (par. IV) and recorded the notice of completion; and Santa Barbara knew 'that said property contained adobe, or expansive soil, requiring special structural safeguards which were not included in this house.' (Par. IV.) The location and disposition of the other four lots is not indicated; the allegations with respect thereto appear to have no relevancy.

"Santa Barbara's alleged participation was that of the usual and ordinary construction and purchase money lender, content to lend money at interest on the security of real property. Approval of plans and specifications, and periodic inspection of houses during the construction is normal procedure for any construction money lender. The allegation that it supervised construction is a conclusion and will be disregarded. Unlike *Connor,* its financing did not take on 'ramifications beyond the

domain of the usual money lender.' (*Connor*, p. 864.) Unlike *Connor*, it was not financing the development of a large tract wherein it sought to receive substantial fees for making construction loans. Unlike *Connor*, it did not receive a fee for 'warehousing' the land. Unlike *Connor*, it received no guarantee from loss of profits in the event a home buyer sought permanent financing elsewhere. Unlike *Connor*, it was not 'preoccupied with selling prices and sales.' (*Connor*, p. 860.) . . .

"There is little similarity between Great Western's activity in *Connor* and Santa Barbara's in the instant case. In *Connor* the lender was an active participant; its activities had a direct and major effect on the plaintiffs and others in their class. In the instant case Santa Barbara's alleged participation had little or no effect on plaintiffs. Its participation appears to have been limited to that of a conventional construction lender. It had no interest as to whether the property was sold, rented or occupied by the builder. It had no interest as to whether he made a profit on the sale or as to terms of sale. It was content to merely loan money at interest on the security of the property; its supervision was for this limited purpose. We hold that under the first *Biakanja* test, Santa Barbara's participation was so minimal and restricted that it had no effect on plaintiffs; that as a result, Santa Barbara owed purchasers of the property, including plaintiffs, no legal duty to protect them from damages caused by defects in construction, and that the demurrer was properly sustained on this ground." So be it in the case at bench.

In *Drake* v. *Morris Plan Co.*, 53 Cal.App.3d 208 [125 Cal.Rptr. 667], Ernest Drake met his death in a collision with an automobile being operated by one Stafford. It was alleged that Stafford was an alcoholic unfit to safely operate a motor vehicle and that this was known to Morris Plan at the time it financed the sale of the car to Stafford. Drake's heirs sought damages from Morris Plan for negligently supplying, entrusting and financing the vehicle to such a person. A general demurrer was sustained by the trial court and the action dismissed. In affirming the judgment of dismissal this court said at pages 211, 213:

"Recognizing the novelty of the attempt to plead a cause of action against Morris Plan under these facts and envoking what is termed a modern trend of expanding tort liability, plaintiffs by analogy to the rationale of *Johnson* v. *Casetta*, 197 Cal.App.2d 272 [17 Cal.Rptr. 81], and of *Perez* v. *G & W Chevrolet, Inc.*, 274 Cal.App.2d 766 [79 Cal.Rptr. 287], argue that knowingly enabling an incompetent person to drive by financing his purchase of a motor vehicle creates liability to third persons

under a theory of negligent entrustment espoused in such cases as *Rocca v. Steinmetz,* 61 Cal.App. 102 [214 P. 257]; *Kanananakoa* v. *Badalamente,* 119 Cal.App. 231 [6 P.2d 338]; *Knight* v. *Gosselin,* 124 Cal.App. 290 [12 P.2d 454]; *McCalla* v. *Grosse,* 42 Cal.App.2d 546 [109 P.2d 358]." .

"In the case at bench the allegations of the complaint do no more than establish that Morris Plan's participation in the transaction was that of a conventional money lender. As said at page 476 in *Bradler* of the lender therein, 'It had no interest as to whether he made a profit on the sale or as to terms of sale. It was content to merely loan money at interest on the security of the property; its supervision was for this limited purpose.' We hold likewise in the instant case that Morris Plan's participation in the sale of the vehicle was so minimal and restricted that the transaction did not create a legal duty on the part of the lender to protect plaintiffs from damages caused by Stafford's illegal use of his automobile . . . ."

In view of the enactment of Civil Code section 3434 and the decisions of the appellate courts in *Fox & Carskadon* and *Drake, supra,* any modern trend extending the duties and obligations of a conventional lender that may have surfaced in *Connor, supra,* would appear to have again submerged.

We have examined the cases of *Biakanja* v. *Irving, supra,* 49 Cal.2d 647, *Middlebrook-Anderson Co.* v. *Southwest Sav. & Loan Assn.,* 18 Cal.App.3d 1023 [96 Cal.Rptr. 338], and *Radunich* v. *Basso,* 235 Cal.App.2d 826 [45 Cal.Rptr. 824], relied upon by cross-complainant and find them factually distinguishable and not otherwise compelling of a different decision herein.

Since the theories advanced by Kinner in each of the five separate causes of action in the amended cross-complaint presuppose the existence and breach of the duty or obligation unsuccessfully sought to be imposed upon World in this case, our decision herein on that issue eliminates any need to consider the technical sufficiency of the allegations in each cause of action separately.

■ Respondent contends that it is entitled to recovery of reasonable attorneys' fees by virtue of the provision in the deed of trust allowing recovery of such fees in "any action or proceeding purporting to affect the security hereof . . . or the rights or powers of Beneficiary. . . ." We do not agree. The cross-complaint does not allege any cause of action which

directly or indirectly affects the beneficiary's security nor its rights or powers.

The judgment (order of dismissal) is affirmed.

Cobey, Acting P. J., and Potter, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 24, 1976.