[S. F. No. 16200. In Bank.—October 14, 1940.]

THOMAS GUY SHAFER, Respondent, v. REGISTERED PHARMACISTS UNION LOCAL 1172 et al., Appellants.

James F. Galliano for Appellants.

Carleton L. Rank for Respondent.

EDMONDS, J.—By this appeal the defendants, Registered Pharmacists Union Local 1172, its president and its business agent, challenge a decree permanently enjoining them from picketing and boycotting the plaintiff's places of business. The determinative question in the case is whether closed union shop agreements have been rendered unlawful in this state by virtue of the enactment of sections 920, 921, and 923 of the Labor Code.

The facts were presented to the trial court upon an agreed statement and are undisputed.

The respondent operates a small chain of retail drug stores in Oakland, California, doing business under the name of "Guy's Drug Stores." In 1937, he entered into a collective bargaining agreement with the union with respect to fourteen pharmacists and assistant pharmacists in his employ. This contract, which by its terms was to continue in force for one year, provided, among other things, that the pharmacists then employed, or thereafter hired by him, should apply for membership in the union. The union in turn agreed to take the respondent's then employees into its membership, and in good faith to consider and pass upon the membership qualifications of future applicants in the regular manner and according to the usual standards required by it in admitting new members. The parties are agreed that the effect of their contract was to require the employer to retain only union-member pharmacists in employment and to recognize the defendant union as the sole collective bargaining agent of the employees who were subject to it.

At the end of the year the respondent refused to renew the agreement unless the closed shop provisions were deleted, although other drug store owners representing a substantial portion of the retail drug industry in that locality entered into and renewed similar agreements with the defendant union. Thereupon, the union declared a strike against him and started picketing his stores. All of his pharmacists responded to the strike call except three executives, who had not been subject to the agreement, and one non-executive employee who subsequently resigned from the union. The picketing was in every respect peaceful. The respondent suffered substantial and irreparable injury to his business as a result of the defendants' acts.

From these facts the trial court found in effect that the union's object was to force the employer to execute a closed union shop agreement obligating him to require his pharmacist employees, present and prospective, (1) to designate the union as their collective bargaining agent and (2) to become and remain members of the union as a condition of employment. The court concluded that such an object was unlawful and issued a permanent injunction prohibiting the appellants, in

broadest terms, from picketing or boycotting the respondent's places of business.

In the absence of any controlling statutory provisions, the activities of the appellants may not be enjoined under the circumstances stated. It is established in this state that peaceful picketing is a lawful form of concerted action by the members of a labor union (*Lisse* v. *Local Union*, 2 Cal. (2d) 312 [41 Pac. (2d) 314]; *In re Lyons*, 27 Cal. App. (2d) 293 [81 Pac. (2d) 190]), and it was long ago held by this court that the securing of a closed shop contract with an employer is as proper an object of concerted action by employees, as is the attainment of higher wages, shorter hours of labor or better working conditions (*Parkinson Co.* v. *Building Trades Council*, 154 Cal. 581 [98 Pac. 1027, 16 Ann. Cas. 1165, 21 L. R. A. (N. S.) 550]). However, the employer successfully contended in the trial court that by the enactment of sections 920, 921 and 923 of the California Labor Code the legislature outlawed closed shop contracts. The correctness of that conclusion is the question decisive of this appeal.

The Labor Code provides: "Every promise [as defined by section 920] made after August 21, 1933, between any employee or prospective employee and his employer, prospective employer or any other person is contrary to public policy if either party thereto promises any of the following: (a) To join or to remain a member of a labor organization or to join or remain a member of an employer organization. (b) Not to join or not to remain a member of a labor organization or of an employer organization. (c) To withdraw from an employment relation in the event that he joins or remains a member of a labor organization or of an employer organization." Such a promise, the section continues, "shall not afford any basis for the granting of legal or equitable relief by any court against a party to such promise, or against any other persons who advise, urge, or induce, without fraud or violence or threat thereof, either party thereto to act in disregard of such promise." (Sec. 921.)

In this legislation the state's public policy with regard to labor organizations was stated as follows: "Negotiation of terms and conditions of labor should result from voluntary agreement between employer and employees. Governmental authority has permitted and encouraged employers to organize in the corporate and other forms of capital control. In deal-

ing with such employers, the individual unorganized worker is helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment. Therefore, it is necessary that the individual workman have full freedom of association, self-organization and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." (Sec. 923.)

Concerning these provisions the respondent argues that a closed union shop contract violates the terms of section 923 in that it deprives the individual employee of his right of "freedom of association, self-organization, and designation of representatives of his own choosing" guaranteed by that section. Moreover, it is said, such a contract also violates section 921 because its effect is to require an individual employee "to join" and "to remain a member of a labor organization". On the other hand, the appellants contend that these measures were drafted and proposed at the instance of organized labor for the purpose of extending and safeguarding the principle of collective bargaining, and considering their history and background, they should not be interpreted contrary to the principle they were designed to promote.

It is a well-settled rule of statutory interpretation that courts may and should have recourse to available extrinsic aids in order to discover the meaning and purpose of legislation (*Story* v. *Richardson,* 186 Cal. 162 [198 Pac. 1057, 18 A. L. R. 750] ; *Mundell* v. *Lyons,* 182 Cal. 289 [187 Pac. 950] ). Also, in enforcing the command of a statute, both the policy expressed in its terms and the object implicit in its history and background should be recognized. (See Stone, The Common Law in the United States, 50 Harv. L. Rev. 4, 12–16; Landis, A Note on "Statutory Interpretation", 43 Harv. L. Rev. 886, 891, 892.)

Impartial studies of the labor movement in this country show that for many years the extension of collective bargaining in industrial relations has been opposed by employers. Chief among the devices resorted to for that purpose has been the anti-union or "yellow dog" contract, an agreement be-

tween an employer and his employee which, in its usual form, provides that the employer will maintain his business on a non-union basis and the employee will not become a member of any labor union during the course of his employment. (Such a contract is set out in full in *Hitchman Coal & Coke Co.* v. *Mitchell*, 245 U. S. 229 [38 Sup. Ct. 65, 62 L. Ed. 260, Ann. Cas. 1918B, 461, L. R. A. 1918C, 497]. References to other examples appear in Landis, Cases on Labor Law, p. 131, n. 9.) When first used these agreements were little more than psychological deterrents to the growth of labor unions (see Cochrane, Why Organized Labor Is Fighting "Yellow-Dog" Contracts, 15 Am. Lab. Leg. Rev. 227, 228), but in 1917 the Supreme Court of the United States gave equitable sanction to such contracts by enjoining attempts to unionize workmen who had subscribed to them. (*Hitchman Coal & Coke Co.* v. *Mitchell, supra.*) Following this decision many employers used such contracts to prevent the penetration of independent labor unions into their plants. (Landis, Cases on Labor Law (1934), note 131 at 181, 182; Seidman, The Yellow Dog Contract (1932), 29 et seq.; Witte, The Government in Labor Disputes (1932), note 136 at 221, 222.)

However, with the growth of the labor movement in this country and the development of public opinion more favorable to collective bargaining, industry found it advisable to change the methods of opposition. Many employers, although professing to accept the principle of collective bargaining and unionization by which it is made effective, either directly or indirectly sponsored company controlled unions having no members except their own employees, and by that means were able to minimize the workers' demands. This was a change in method only. Formerly, the chief defense of an employer against the unionization of his employees was a requirement that each prospective employee promise not to join a union; under the new plan a promise was exacted that he would join the company union. (4 Encyc. Soc. Sciences, Company Unions, 123 (1931); Labor and the Government, Twentieth Century Fund, Ins. (1935), 60–62; Commons, History of Labor in the U. S., vol. III (Lescohier), p. 336, et seq. (1935).)

Following the World War the company union came into very wide use in industry, and although a few of these associations were relatively free of employer domination and de-

veloped the necessary independence to represent their members fairly, by and large, as the investigations of impartial observers have shown, the single shop or company union has inherent weaknesses which prevent it from becoming an effective bargaining unit for the employees which it represents. (Labor and the Government, *supra*, at 65–113, 323–32; 4 Encyc. Soc. Sciences, 124–45; 37 Columb. L. Rev. 816, 827, et seq.; 40 Columb. L. Rev. 278–309.) As organized labor consistently looked upon such unions as impediments to effective collective bargaining and also as unduly restricting the rights of workers it sponsored and worked to secure corrective legislation. (See Landis, Cases on Labor Law, 181, 182.) These efforts met with some success. (See Railway Labor Act of 1926, 44 Stat., p. 2577; National Labor Relations Act (1935), 49 Stat. 449, 453, sec. 8.) Labor is also responsible for the passage of the Norris-La Guardia Act (47 Stat. 70) and state legislation based upon it, which although designed mainly to restrict the use of the labor injunction, also outlaw "yellow dog" contracts and, in the variants adopted by some legislatures, include provisions rendering company union contracts unlawful. (See Frankfurter and Greene, The Labor Injunction, 205 et seq.; Frankfurter and Greene, Labor Injunctions and Federal Legislation, 42 Harv. L. Rev. 766; Fraenkel, Recent Statutes Affecting Labor Injunctions and Yellow Dog Contracts, 30 Ill. L. Rev. 854–859; Fraenkel, Judical Interpretation of Labor Laws, 6 Chic. L. Rev. 577, 581; 11 So. Cal. L. Rev. 484.)

The California legislation is the result of labor's efforts along these lines. In 1933, the legislature refused to pass a bill to enact a model anti-injunction law (A. B. 315) as it was presented, adopting only its declaration of policy (sec. 923, Labor Code) and the provisions which declare anti-union and company union contracts to be contrary to public policy. (Secs. 920, 921, Labor Code.) But there can be no doubt that the intended effect of this legislation was to balance the industrial equation, so far as it is possible to do so, by placing employer and employee on an equal basis. This purpose is plainly evinced by section 923, which commits the state, as a matter of public policy, to the principles of collective bargaining. In dealing with his employer, the individual workman is said to be unable either to bargain on equal terms or to combine with his fellow workmen in order to enhance

his bargaining power, hence, it is necessary that he be free to associate, organize, and to designate representatives of his own choosing. And in order to make certain that the right to associate and organize be exercised without interference by the employer, the legislature provided that if the employer, as a condition of employment, exacts a promise to join or not to join a labor union, he shall have no right to injunctive relief or damages upon a violation of that promise.

However, the legislature recognized also that as a necessary corollary of the employee's freedom to contract, he should not require his employer "to join or remain a member of an employer organization" or, on the other hand, "not to join or not to remain a member of an employer organization". This provision, which is in accordance with the purpose of such legislation, apparently had its genesis in the Federal Railway Labor Act of 1926 (*supra,* sec. 2) which provides for settlement of labor disputes by conference between representatives of the employers and employees chosen "without interference, influence or coercion exercised by either party over the self-organization or designation of representatives by the other". (See Frankfurter and Greene, The Labor Injunction, p. 213.) That some restraint may well be laid upon any demands of labor concerning organizations of employers is apparent from situations such as that disclosed in the case of *Overland Pub. Co.* v. *H. S. Crocker Co.*, 193 Cal. 109 [222 Pac. 812]. Bearing in mind the necessity for economic equality as a foundation for fair bargaining, the plain language of section 921, when read in connection with the declaration of policy contained in section 923, can only mean that the term "employer organization", as used in each subdivision of the former, refers to an association of employers and not to a company union, as the respondent contends.

Considering another point made by the employer in this connection, the clause "to join or to remain a member of a labor organization" may not reasonably be construed as prohibiting a promise to join an independent labor union. Although the term "labor organization", taken by itself, is broad enough to refer to either a company or an independent union, the purpose of the legislation must be considered in arriving at a conclusion concerning its meaning. If the words are meant to designate an independent union, then it is against public policy for an employee or prospective employee

to join such an organization, which is a result exactly contrary to the declaration of policy in section 923. In matters of both employment and concerted activity for the purpose of collective bargaining, reads this section, the employee "shall be free from interference, restraint or coercion of employers of labor, or their agents". What is this "interference, restraint or coercion" which should not be exercised against employees? Obviously it is anything which is a barrier to the full freedom of association and self-organization without which "the individual unorganized worker is helpless to exercise actual liberty of contract". Who should not interfere with the employees' rights? "Employers of labor or their agents", says the statute. Nowhere is there the suggestion that some employees must be protected against other employees.

■ These and other considerations render untenable the contention that union shop contracts in California are void under section 921. As has already been noted, the usual company union contract is an individual agreement between the employer and an employee, whereas the union shop contract is an agreement running between the employer and the union as an entity. (*M. & M. Wood Working Co.* v. *N. L. R. B.* (C. C. A. 9th), 101 Fed. (2d) 938; see 37 Columb. L. Rev. 816, 824, n. 59 (1937); Fuch, Collective Labor Agreements in American Law, 10 St. Louis L. Rev. 1 (1925).) The courts of this state have recognized the validity of closed union shop agreements for more than thirty years. The legislature has also shown its approval of the propriety of such contracts by the enactment of other provisions of the Labor Code. Thus, it is a crime to misrepresent the kind of labor employed in producing goods (sec. 1011, Labor Code); to make misrepresentations regarding the employment of union labor in connection with the sale of goods (sec. 1012); to forge a union label or trademark (sec. 1015); or to use a union label without authorization (sec. 1016). Considering all of these circumstances, a legislative intention to declare the closed shop contract unlawful will not be presumed.

■ The argument is also made that it is absurd to suppose that these provisions were written with the intention of restraining the employer from influencing his employee, while at the same time conferring upon other individuals the right "to coerce" the same employee through the employer. But

the right of workmen to organize for the purpose of bargaining collectively would be effectually thwarted if each individual had the absolute right to remain "unorganized", and using the term adopted by the appellants to designate the economic pressure applied against them through the employer, coercion may include compulsion brought about entirely by moral force. Certainly such compulsion is not made contrary to public policy by any statute of this state and is a proper exercise of labor's rights. (*Senn* v. *Tile Layers Union,* (1937) 301 U. S. 468 [57 Sup. Ct. 857, 81 L. Ed. 1129]; *Lauf* v. *E. G. Shinner & Co.,* (1938) 303 U. S. 323 [58 Sup. Ct. 578, 82 L. Ed. 872]; *Fur Workers' Union No. 72* v. *Fur Workers' Union No. 21238,* (1940) 105 Fed. (2d) 1 [70 App. D. C. 122], affd. 308 U. S. 522 [60 Sup. Ct. 292, 84 L. Ed. 443].)

The argument that provisions similar to those now being considered guarantee employees freedom "from all interference" in their selection of a collective bargaining agent has been accepted by several state courts. (*Roth* v. *Local Union, etc.,* (Ind.) 24 N. E. (2d) 280; *Fornili* v. *Auto Mechanics Union,* 200 Wash. 283 [93 Pac. (2d) 422].) Such reasoning was also adopted by the Circuit Court of Appeals in its decisions in *Lauf* v. *E. G. Shinner & Co.,* 82 Fed. (2d) 68, 90 Fed. (2d) 250, and by the dissenting members of the Supreme Court upon a review of the case, but was rejected by the majority. (303 U. S. 323.) It is not in accordance with the law of this state, as judicially declared for many years, nor is it based upon a fair construction of sections 920 to 923 of the California Labor Code, considering their history and purpose. These sections lay no statutory restraints upon the workers' efforts to secure a closed shop contract from an employer, hence the appellants' picketing was lawful and should not have been enjoined.

The judgment is reversed with directions to the trial court to dissolve the injunction.

Gibson, C. J., Carter, J., and Moore, J., *pro tem.,* concurred.

CURTIS, J., SHENK, J., and MARKS, J., *pro tem.,* Dissenting.—We dissent for the reasons stated in the dissenting opinions in the case of *McKay* v. *Retail Automobile Sales-*

*men's Local Union, No. 1067,* S. F. No. 16016 (*ante,* pp. 335, 336 [106 Pac. (2d) 373]).

Rehearing denied. Shenk, J., Curtis, J., and Houser, J., voted for a rehearing.