[Civ. No. 42439. Second Dist., Div. Three. June 27, 1974.]

CHRISTOPHER KNOPF et al., Plaintiffs and Appellants, v.
PRODUCERS GUILD OF AMERICA, INC., Defendant,
Cross-complainant and Respondent;
ASSOCIATION OF MOTION PICTURE AND TELEVISION
PRODUCERS, INC., et al., Defendants and Respondents;
WRITERS GUILD OF AMERICA, WEST, INC.,
Cross-defendant and Appellant.

## COUNSEL

Selvin & Barth and Paul P. Selvin for Plaintiffs and Appellants and for Cross-defendant and Appellant.

Robert W. Gilbert for Defendant, Cross-complainant and Respondent.

Loeb & Loeb, Albert F. Smith and David G. Miller for Defendants and Respondents.

## OPINION

**POTTER, J.**—Five[1] individual plaintiffs filed a complaint on May 1, 1969, suing on behalf of themselves and all other members of a class of persons employed in the motion picture and television industry described therein as "employee-producers," joining as defendants the Producers Guild of America, Inc. (PGA), its then officers, the Association of Motion Picture and

---

[1] A sixth plaintiff was later added pursuant to stipulation.

Television Producers, Inc. (AMPTP) and 64 of its member production companies.

The complaint alleged three causes of action (1) for declaratory relief determining (a) PGA's lack of status as a labor organization, and (b) the invalidity of a collective bargaining agreement negotiated by PGA; (2) for damages and for injunctive relief based upon alleged breach of PGA's duty of fair representation, and (3) for damages and for injunctive relief based upon alleged violation of the Labor Code of the State of California.

The gravamen of the complaint was that the rights of "employee-producers" were violated by the conduct of the defendants in relation to the negotiation and execution of a collective bargaining agreement signed on behalf of the employers by "Charles Boren,"[2] and on behalf of PGA by "Lou Greenspan,"[3] a copy of which was attached to the complaint as an exhibit.

The function of producers is that of supervising the creative and physical aspects of the making of motion pictures or television productions. Persons performing these functions normally do so in the employment of production companies. All parties agree that while performing such functions producers constitute supervisory personnel, exempted as such from the operation of the National Labor Relations Act. The term "employee-producers" as used by plaintiffs refers to such supervisors who are simply employed by production companies in such capacity; that is, they do not have any ownership interest as major shareholders or principal partners of production companies nor status as corporate officers thereof. Producers having such ownership or officer status are referred to in the complaint as "owner-producers." They are hereinafter referred to as "employer-producers," since that term more accurately describes them.

According to the complaint, PGA assumed the role of sole collective bargaining agent for all producers and negotiated the collective bargaining agreement, recognizing it as such, at a time when it was dominated, controlled and influenced by employers by virtue of its having as its directors, officers and members of its negotiating committee persons a majority of whom were "employer-producers." The complaint further charges that not unexpectedly under the circumstances and as a result of the PGA officials' breach of their duty of fair representation, the

---

[2]Mr. Boren was the executive vice-president of AMPTP, the multi-employer bargaining association for the motion picture and television industry, and it was stipulated at trial that he "was the primary negotiator on behalf of the AMPTP negotiating group in connection with the PGA agreement . . . ."

[3]Mr. Greenspan was the executive director of PGA.

collective bargaining agreement negotiated by them failed to provide any substantial benefits for "employee-producers."

AMPTP and its member companies answered the complaint, denying most of the material allegations. In addition, they raised an affirmative defense which attacked the plaintiffs' good faith representation of the purported class and asserted a lack of clean hands on the basis of the fact that the named plaintiffs were "writer-producers" (otherwise known as "hyphenates") and members of the rival Writers Guild of America, West, Inc. (WGA), which was financing the litigation as an integral part of a jurisdictional contest between it and defendant PGA.

PGA and its officers answered similarly, denying the plaintiffs' charges that it was financed, interfered with, dominated or controlled by employers and alleging that the collective bargaining agreement had been ratified by a majority of its membership.[4] The PGA answer also raised the affirmative defense of unclean hands based upon the involvement of the WGA.[5]

PGA also filed a cross-complaint against WGA, seeking declaratory and injunctive relief based upon allegations charging WGA with interference in PGA's representation of producers in an attempt to supplant it as their bargaining representative. The purpose of the cross-complaint was to have it determined that WGA could not represent producers, who were supervisors over its writer members. None of the issues thus posed by the cross-complaint were adjudicated,[6] and they are not involved in this appeal.

The trial commenced in April 1972. Plaintiffs rested at the commencement of the fifth day of trial, whereupon defendants moved to strike various exhibits, most of which had been admitted in evidence subject

[4]This fact is undisputed. The record includes an exhibit (Plf. No. 48) which was introduced into evidence which indicates that by a vote of 160 to 2 the individual members had ratified the action of the board of directors of PGA in entering into the basic agreement with the members of AMPTP.

[5]These affirmative defenses were stricken from both answers on plaintiffs' motion on the ground they failed to state facts constituting a defense.

[6]PGA withdrew its prayers for injunctive relief based upon the cross-complaint, leaving only the prayer for a declaration of rights. The court did not, however, include any such declaration in its judgment, though it did find as facts that WGA's role in the controversy included instigating it and financing it in furtherance of its rival jurisdictional claims. PGA has not appealed from the judgment and consequently there is no issue on this appeal with respect to any declaration of WGA's status or lack of status as a lawful collective bargaining representative for producers.

to such a motion.[7] These exhibits consisted of answers to interrogatories and compilations made therefrom. They showed how many of the directors, officers and members of the negotiating committee of the PGA, at and prior to the time the collective bargaining agreement was negotiated, were shareholders, officers or directors of production companies that were signatories to the agreement. The facts shown in these exhibits were the main basis of plaintiffs' claim that PGA was a labor organization interfered with, dominated or controlled by employers.

When the motion to strike was taken under submission, defendants moved for a judgment in their favor under Code of Civil Procedure section 631.8. Upon denial of that motion defendants, without offering any evidence, rested with respect to the issues presented by the complaint and answers. By stipulation such issues were bifurcated from those presented by the cross-complaint and the matter taken under submission.

Thereafter, on May 26, 1972, the court entered its order granting the motion to strike the exhibits and indicated its intended decision in favor of defendants on the issues presented by the complaint and answers thereto.

The trial court thereafter signed findings of fact and conclusions of law and caused a judgment to be entered which declared as between all the parties:

1) PGA "is a bona fide labor organization" within the meaning of the California Labor Code;

2) The collective bargaining agreement is "a valid and enforceable collective bargaining agreement" within the meaning of the Labor Code;

3) There has been no breach of the duty of fair representation by PGA; and

4) PGA is not financed, interfered with, dominated or controlled by employers within the meaning of the Labor Code.

. Except for the allowance of costs to defendants PGA and AMPTP, all other relief was, in effect, denied.

---

[7] These exhibits were identified as Plaintiffs' Exhibits 12-A, 12-B, 12-C, 14, 15, and 23 through 29. They set forth what were essentially undisputed facts to the effect that officers, directors and negotiating committee members of PGA were also officers, directors and substantial shareholders in various production companies who were members of AMPTP and signatories to the collective bargaining contract. It was the position of defendants that these "bare" facts, which were not denied, were not relevant to any issue in the case.

The individual plaintiffs and WGA filed a joint notice of appeal from the judgment.

## Facts

Though there is total disagreement as to their legal effect, the parties have no real dispute as to the facts pertinent to this appeal. As disclosed by the pleadings, the findings and uncontradicted evidence, these facts are as follows:

The supervisory function performed by producers in the motion picture and television industry traditionally was performed pursuant to and governed solely by individual employment contracts between producers and production companies. Some producers were also beneficial owners of substantial interests in production companies or were corporate officers of such production companies; many others, including the named plaintiffs, were not in that category. Though defendant PGA existed since 1950 as a nonprofit corporation to represent both categories of producers generally in connection with industry matters affecting them, it was not until 1966 that any steps were taken to undertake collective bargaining efforts in behalf of producers. In that year the membership of PGA adopted an amendment to its articles to include, as a corporate purpose, "to represent persons engaged in the motion picture, television and allied industries, as producers, and to engage in collective bargaining on their behalf . . . in connection with motion picture, television and allied industry matters directly or indirectly affecting their efficiency, wages, hours and working conditions; . . ."

The records of PGA relating to the adoption of the amendment disclosed the membership's objective of seeking, through such collective bargaining, "the same benefits as to pensions, residuals, salaries and credits as are now enjoyed by the other Guilds."[8]

After the amendment to its articles, PGA initiated steps to implement its new purpose. A negotiating committee was organized in August 1967, and on August 14, 1967 such committee received recommendations from various subcommittees covering a variety of negotiating aims, including contract provisions for a guild shop, credit for producers, pension, health and welfare plans, residuals and minimum compensation comparable to that provided by the Directors Guild agreement, which was $450 weekly. Thereafter, meetings between the Guild negotiating committee and representatives of the AMPTP occurred with respect to these objectives.

---

[8] The Guilds referred to were the WGA, the Directors Guild of America, Inc., and the Screen Actors Guild.

Very little documentation of negotiating demands or proposals from either side was generated in the negotiation process. That which was produced in court indicated that in April 1968 the negotiations were at an impasse over the Guild's demand for "guild shop recognition." This was considered by the Guild to be an indispensable concomitant of any pension plan, because otherwise "there would be no valid reason for producers to join or remain members of the Guild if they can obtain the benefits of a Pension Plan outside the jurisdiction of the Guild." However, on June 10, 1968, this impasse was broken by AMPTP writing a letter, indicating its willingness to discuss an agreement for a term of 20 years and "limited to the following matters only:

1) An appropriate Guild Shop provision;

2) the establishment of a Pension Plan; and

3) the establishment of a Health and Welfare Plan."

Subsequent negotiations reduced the term from 20 years to 10 years and a proposed agreement along the lines above set forth was approved by the board of directors of PGA on October 14, 1968, subject to minor clarification of language defining producers covered thereby. After such clarification the agreement was submitted to the membership for ratification on November 6, 1968, and approved by a vote of 160 to 2.

The only direct evidence explaining the lack of negotiations concerning the initial objectives other than recognition and guild shop, pension, health and welfare, was the testimony of Charles Boren to the effect that the Association made a unilateral statement early in the meetings that it would not discuss any of such other matters.

The agreement as executed recognized the PGA as the sole collective bargaining agent for all producers with respect to their employment on Los Angeles based pictures or when hired in Los Angeles. Its significant terms were: (a) provision for the maintenance of a guild shop, (b) inclusion of producers in the industry health and welfare plan, (c) establishment of a pension plan pursuant to which employers were called upon to contribute an amount equal to 5 percent of the producers' salaries, and (d) the establishment of a cooperative committee to deliberate concerning matters affecting the operation and application of the contract and to promote a "harmonious Employer-Employee relationship." The agreement had an effective term of "not less than" 10 years, and provided that it "shall continue after such ten year period, subject to termination only as hereinafter provided." The only termination provided for was

upon one year's advance written notice after a failure of the parties to reach a mutual agreement upon a reopening initiated during the ninth year of the term. However, the subject matters of "minimum compensation or residuals" were expressly excluded as bases for reopening. The agreement further provided that during its term the Guild would have "no right to require the Employers to bargain on any terms or conditions relating to employment, including those covered herein," though it specifically reserved to producers the right to bargain individually with respect to any terms relating to employment not covered by it.

As above stated, the evidence relied upon by plaintiffs to establish that PGA was a labor organization which was financed, interfered with, dominated or controlled by employers consisted largely of information contained in answers given by defendants to interrogatories of plaintiffs. It included such answers and various compilations of data taken therefrom and presented in schedule form. No question was raised by defendants concerning the accuracy of the information as stated in the answers to interrogatories or as presented in the schedules.[9] It is, therefore, appropriate and necessary, in order to consider the contentions of the parties on this appeal, to take cognizance of what these exhibits showed as a matter of fact. The answers of PGA to interrogatories gave a list of its officers, the membership of its board of directors, and all the members of its negotiating committee for the period of time during which activities relating to the negotiation of the collective bargaining agreement occurred. Answers to interrogatories filed on behalf of AMPTP and its member companies identified all the production companies who were signatories to the collective bargaining agreement. After such information had been acquired, plaintiffs asked each of the PGA officials so identified to answer interrogatories disclosing whether while he was a PGA official he had any ownership interest or corporate officer status in a production company which was a signatory to the bargaining agreement.

The information contained in all these answers was correlated by plaintiffs and presented in several schedules. They were among the exhibits received and subsequently stricken, being numbers 23 through 29. An examination of these schedules (the accuracy of which has never been ques-

---

[9]In the argument on the motion to strike these exhibits, Albert F. Smith, counsel for defendant AMPTP, stated with respect to such material, ". . . no one is disputing the factual accuracy of the information in these charts; namely, the fact that specific individuals who were members as persons, members of the Producers Guild, also held various offices, were directors, stockholders or what have you of the respective member companies of AMPTP." Counsel for PGA was present when this statement was made and acquiesced in it by joining in the position taken.

tioned by defendants) substantiates appellants' claim that the "overwhelming majority" of the PGA officials in all capacities were "employer-producers" during the relevant time span.

Significant details in this respect were:

(1) All of the presidents of PGA from 1966 through the time of trial were owners of more than 50 percent of the stock of a signatory production company and held corporate office as president of such company.

(2) There were 13 persons who served on the PGA negotiating committee during 1967 and 1968. Of these, five were the owners of more than 50 percent of the stock of, and president of, signatory companies; two more were shareholders with less than 50 percent of the stock of, but holding office as president or vice-president of, signatory production companies; and two others, though not stockholders, were presidents of signatory production companies. Of the 13 members of the negotiating committee, only three were without ownership interest or corporate office in a signatory production company.

(3) The composition of the board of directors of PGA included a lesser but significant number of persons holding shares in or corporate office with production companies. For the entire period from 1966 to the date of the trial the majority of the directors of PGA were corporate officers of signatory companies. More significant, however, was the composition of the board as of October 18, 1968, when the collective bargaining agreement was entered into. At that time there were 18 members on the PGA board of directors of whom 10 were shareholders (7 holding more than 50 percent of the stock) of signatory production companies and 13 (including such 10) were officers of signatory production companies.

As a further basis to question the validity of the collective bargaining agreement, plaintiffs sought to introduce in evidence copies of all of the Guild agreements from 1935 to the date of trial of each of the three other Guilds recognized as collective bargaining agents in the entertainment industry, "to show what standards a collective bargaining agreement should reach and to show what collective bargaining agreements therein did and do cover." The court refused to admit these exhibits. However, other evidence of common and basic subjects included in collective bargaining agreements was received, including the PGA's own statements of objectives for the negotiations, and testimony of plaintiffs' witnesses concerning matters they desired be dealt with through collective bargaining.

Plaintiffs did not, however, attempt to provide the court with any evidence on the basis of which it could have ascertained and awarded

damages for breach of PGA's duty of fair representation or damages under section 1122 of the Labor Code, and there is no argument made in appellants' briefs to the effect that any such damages were shown.[10]

### Issues

In view of the limited nature of the contentions raised by appellants, the issues on this appeal are:

1) Was the PGA shown by the uncontradicted evidence to be, as a matter of law, a labor organization interfered with, dominated or controlled by employers?

2) Was the collective bargaining agreement negotiated by PGA thereby rendered invalid?

3) Was the collective bargaining agreement so lacking in provisions for the benefit of employees as to constitute no collective bargaining agreement at all and be thereby rendered invalid?

### Contentions

The court found (Finding No. IX) as follows: "PGA is not and has not been financed in whole or in part, interfered with, or dominated or controlled by any employer or employer association."

Plaintiffs contend that this finding is contrary to the uncontradicted facts shown by the exhibits collating the information contained in the answers to interrogatories. Such exhibits did clearly show the fact that all of the agencies through which PGA acted in relation to the negotiation of the collective bargaining agreement were staffed by persons an overwhelming majority of whom were "employer-producers"; that is, they were holders of substantial ownership interest in production companies or were corporate officers of such companies. This fact alone, according to plaintiffs, "requires the findings and conclusions that PGA was interfered with, dominated and controlled by employers. . . ."

Defendants did not challenge the factual basis of plaintiffs' claim of domination, control and interference. Rather, defendants relied on the legal proposition that supervisors have no status as employees giving rise to any rights that can be violated by such interference, domination or control. The issue, therefore, with respect to this question was a legal

---

[10]In fact, appellants have, by letter to the court supplementing their brief, indicated that "[f]urther trial proceedings for a monetary award for detriment already suffered are not sought."

one which, in view of the exclusion of supervisors from the coverage of the National Labor Relations Act, required consideration of California law.

The court further found (Finding No. X) as follows: "By negotiating and entering into the PRODUCERS BASIC AGREEMENT OF 1968, PGA fairly represented the producers and associate producers covered thereby for purposes of collective bargaining with the employers party thereto."

Plaintiffs contend that this finding is contrary to the uncontradicted evidence which showed that "it is simply not a collective bargaining agreement within the meaning of the law." Defendants' answer to this contention was that in view of the lack of any compulsion on the part of the production companies to recognize supervisors as employees with collective bargaining rights or the PGA as their collective bargaining agent, there was no evidence from which it could be inferred that any more favorable terms could have been achieved, however militantly pursued.

As will hereafter appear, the determination of the issues with respect to the alleged interference, domination or control of PGA is dispositive of this appeal; consequently, they will be discussed first.

### Producers, Though They Are Supervisors, Are "Employees" With the Fundamental Rights of Workmen

The rights claimed by plaintiffs herein rest solely upon the public policy of the State of California as stated in the Labor Code and in the reported decisions of our appellate courts. All producers are excluded as such from the operation of the National Labor Relations Act because each of them is "employed as a supervisor," and section 2(3) of the act as amended in 1947 states that the word "employee" as used in the act ". . . shall not include any individual employed as a supervisor." Consideration must, however, be given to the federal act because section 14(a) thereof (added in 1947) provides that "no employer subject to this Act [11] shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law either national or local, relating to collective bargaining." Defendants argue that producers are thereby required to be deemed "employers."

The question we must answer, therefore, is twofold: it must be first ascertained what the public policy of the State of California is with

---

[11]The parties stipulated at the time of oral argument that the defendant employers in this case are engaged in interstate commerce and are, therefore, subject to the National Labor Relations Act.

respect to the factual situation presented, and then, if that policy is found to support plaintiffs' contention that "employee-producers" have employee rights, it must be ascertained whether that policy is permissible in view of the doctrine of preemption in labor law set forth in *San Diego Unions* v. *Garmon* (1959) 359 U.S. 236 [3 L.Ed.2d 775, 79 S.Ct. 773].

The policy of California with respect to the employee status of supervisors, and in particular the "employee-producers," is not difficult to ascertain. Under California law the relationship between the "employee-producers" and the production companies is clearly that of employee and employer. It is only necessary to examine the provisions of the collective bargaining agreement executed by and between the defendants, the validity of which is here in issue, to demonstrate this. Said agreement repeatedly refers to the fact that it is intended to cover the "employer-employee relationship" between the signatory companies and producers employed by them. In fact, it specifically limits its operation to situations in which such relationship exists. Article VII, subdivision 1 states: "The provisions of this agreement shall apply only to the employment by Employer of persons as an Executive Producer, Producer or Associate Producer to render services, in an Employer-Employee relationship. . . ." Such recitals in the agreement conclusively establish, as between the parties thereto, the fact that the relationship dealt with was of the nature described. (Evid. Code, § 622.) The correct characterization of producers is, therefore, that of "supervisory employees," the nomenclature used by our Supreme Court to describe comparable personnel (store managers) in *Safeway Stores* v. *Retail Clerks etc. Assn.*, 41 Cal.2d 567, 572 [261 P.2d 721].

The services of producers constitute labor subject to the policy of this state governing that subject. The status of supervisory employees, as a result of the 1947 amendments to the National Labor Relations Act excluding them from its operation, was stated by our Supreme Court in *Safeway Stores* v. *Retail Clerks etc. Assn.*, *supra*, 41 Cal.2d at pp. 572-573, as follows: "By the exclusion of supervisory employees and the regulation of their collective bargaining rights from the federal act the field as to them was left open to state control. [Citations.] . . . .

"The federal amendatory act neither enlarges nor limits the *existing fundamental rights of supervisors*. What it does is to unclassify supervisors as employees under federal and state acts regulating the exercise of employees' collective bargaining rights, coupled with the inhibition against compulsions on the employer engaged in interstate commerce to include supervisors as employees for the purpose of such acts.

"The decisional and other authorities define existing fundamental labor rights. *The right of self-organization and of selection of a bargaining representative are rights which exist independently of labor relations acts.* The existing right includes union organization for the conduct of collective bargaining and the traditional peaceful strike for higher wages. (See Torts, Restatement, § 784.) It was characterized and recognized as a fundamental right long before it was protected under the National Labor Relations Act and similar state acts. (*International Union* v. *Wisconsin Emp. Relations Board*, 336 U.S. 245, 259 [69 S.Ct. 516, 93 L.Ed. 651]; *National Labor Relations Board* v. *Jones & Laughlin Steel Corp.*, 301 U.S. 1, 33 [57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352]; see, also, *International Union* v. *O'Brien*, 339 U.S. 454, 457 [70 S.Ct. 781, 94 L.Ed. 978].) It was the regulation of *this fundamental right of the labor supervisory personnel* formerly included within the federal act that the 1947 amendatory provisions left to the states for separate classification and regulation." (Italics added.)

The Supreme Court thus clearly recognized that supervisory employees have fundamental labor rights which exist independently of labor relations acts. It, therefore, found it necessary to pass upon the contention of Safeway that the concerted activity of the union in respect of the supervisory employees was "not reasonably related to any legitimate interest of organized labor" (*supra* at p. 573) because its purpose was to force such supervisors into the union of their subordinates and thereby place them in a position of divided loyalty.

The right of self-organization and selection of a bargaining representative, referred to in *Safeway Stores, supra*, as the "existing fundamental rights of supervisors," are the same rights that are recognized by the applicable provisions of the Labor Code of California setting forth the policy of this state with respect to all labor. The statement of the Supreme Court in that respect is but a paraphrase of section 923 of the Labor Code which guarantees each employee "full freedom of association, self-organization, and designation of representatives of his own choosing." Moreover, that policy, as stated in section 923, also includes protection "from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." Freedom from such interference is as much a part of the fundamental right as is the right to associate and organize; consequently, supervisory employees, having the right to associate and conduct concerted activities, also have the right

not to be interfered with by employer influence within the organizations through which they exercise these rights.

Though California has no labor relations act as such and has generally followed a noninterventionist policy in this field, "in a few selected areas the Legislature has moved to proscribe specific tactics of both labor and management, tactics with detrimental consequences which clearly outweigh any possible social benefit." (*Englund* v. *Chavez,* 8 Cal.3d 572, 585 [105 Cal.Rptr. 521, 504 P.2d 457].)

Labor Code section 1122 is an example; it is a more particular statement of the general policy stated in section 923, proscribing one kind of employer interference. This section,[12] added in 1955 to chapter 7 of part 3 of division 2, commonly referred to as the Jurisdictional Strike Act, is not limited in its application to a claimed jurisdictional strike situation. Actually, it deals with circumstances in which, by virtue of section 1117, a strike could not be jurisdictional.

Our Supreme Court has interpreted section 1122 as a specific provision implementing the general independent declaration of state policy contained in section 923. *Chavez* v. *Sargent,* 52 Cal.2d 162 [339 P.2d 801], held that though section 923 was contained in chapter 1 of part 3 of division 2 of the Labor Code and was prefaced by the words "in the interpretation and application of this chapter," it nonetheless stated a policy of general application. In this respect the court said, at page 191: ". . . And *In re Porterfield* (1946), *supra,* 28 Cal.2d 91, 115-118 [27, 28] [168 P.2d 706, 167 A.L.R. 675], established that the policy declared in section 923 of the Labor Code is not limited to the interpretation of the chapter of the code of which that section is a part, *but is a general independent declaration of state policy,* and local legislation in conflict therewith is void. Specifically, it is there held that section 923 declares 'a state policy of complete freedom in regard to the formation of labor organizations to the end that there may be collective action by workmen,' . . ." (Italics added.)

The court also characterized section 1122, saying in that respect, at page 205: "Section 1122, being *in pari materia* with sections 921 and 923 and further implementing the policy therein established, provides additional protection of the individual workman. . . ."

---

[12]Labor Code section 1122 reads as follows: "Any person who organizes an employee group which is financed in whole or in part, interfered with or dominated or controlled by the employer or any employer association, as well as such employer or employer association, shall be liable to suit by any person who is injured thereby. Said injured party shall recover the damages sustained by him and the costs of suit."

Section 1122 is, therefore, a specific implementation of the general independent declaration of state policy contained in section 923 of the Labor Code. As therein stated, that policy is to proscribe any interference with labor's "full freedom of association" as a result of the existence of any "employee group which is financed in whole or in part, interfered with or dominated or controlled by the employer or any employer association."

Defendants' argument that the foregoing policies are not applicable to producers because, by virtue of their supervisory status, all of them are in fact "employers" will not stand analysis. The statement in *Safeway Stores* v. *Retail Clerks etc. Assn., supra,* that supervisory employees have "fundamental labor rights" is to the contrary. Moreover, such holding is consistent with the true facts concerning the relationship of such supervisory personnel to their employer. This relationship was stated by the United States Supreme Court in *Packard Co.* v. *Labor Board* (1947) 330 U.S. 485, 489-490 [91 L.Ed. 1040, 1049, 67 S.Ct. 789], as follows: "Even those who act for the employer in some matters, including the service of standing between management and manual labor, still have interests of their own as employees. Though the foreman is the faithful representative of the employer in maintaining a production schedule, his interest properly may be adverse to that of the employer when it comes to fixing his own wages, hours, seniority rights or working conditions. He does not lose his right to serve himself in these respects because he serves his master in others. . . ."[13]

When the question is that of fixing the wages, hours and other working conditions of producers, the two sides of the collective bargaining equation are the producers as employees and the production companies as employers, regardless of the fact that if the question were the working conditions of non-supervisory employees under the direction of such producers they would be classed as employer representatives.

■ Having concluded that the policy of this state prohibiting collective bargaining agents from functioning as such when they are "interfered with or dominated or controlled by the employer" is applicable to a union of supervisors, we must next determine whether such policy may be permitted to so operate in view of the provisions of section 14(a) of

[13]We realize that by its 1947 amendments to the National Labor Relations Act Congress has perhaps indicated disagreement with the views expressed in this opinion. The supremacy of federal law, however, does not extend to the invalidation of the United States Supreme Court's sound reasoning in respect of a matter over which state courts retain authority.

the National Labor Relations Act and "the ground rules for preemption in labor law." (See *Hanna Mining Co.* v. *Marine Engineers* (1965) 382 U.S. 181 [15 L.Ed.2d 254, 86 S.Ct. 327].) The determination of this question depends on two decisions of the United States Supreme Court: *Hanna Mining Co.* v. *Marine Engineers, supra;* and *Beasley* v. *Food Fair of North Carolina, Inc.* (1974) 416 U.S. 653 [40 L.Ed.2d 443, 94 S.Ct. 2023].

In *Hanna Mining* the question was whether a Wisconsin state anti-picketing statute could be applied against "picketing by a minority union to extract recognition by force of such pressures" (*supra* at p. 190 [15 L.Ed.2d at p. 260]) where such minority union was a union of supervisory employees. The union argued that section 14(a) precluded operation of the state statute. The court disagreed with this contention and held that the Wisconsin courts could proceed to enforce the state law. The court stated in this respect (382 U.S. at pp. 189-190 [15 L.Ed.2d at p. 260]): "This broad argument fails utterly in light of the legislative history, for the Committee reports reveal that Congress' propelling intention was to relieve employers from any compulsion under the Act and under state law to countenance or bargain with any union of supervisory employees. Whether the legislators fully realized that their method of achieving this result incidentally freed supervisors' unions from certain limitations under the newly enacted § 8(b) is not wholly clear, but certainly *Congress made no considered decision generally to exclude state limitations on supervisory organizing.* As to the portion of § 14(a) quoted above, some legislative history suggests that it was not meant to immunize any conduct at all but only to make it 'clear that the amendments to the act do not prohibit supervisors from joining unions . . . .' S. Rep. No. 105, 80th Cong., 1st Sess., p. 28, H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., p. 60." (Fn. omitted.) (Italics added.)

In *Beasley* v. *Food Fair, supra,* the state statute in question was a North Carolina law providing that "No person shall be required by an employer to abstain or refrain from membership in any labor union or labor organization as a condition of employment or continuation of employment" (416 U.S. at p. 655, fn. 2 [40 L.Ed.2d at p. 447]) and for recovery of damages for violation. The defendant Food Fair discharged supervisory employees for union membership. The North Carolina Supreme Court held that section 14(a) of the National Labor Relations Act prohibited enforcement of this state law in favor of supervisors. It reinstated a summary judgment in favor of defendant which had been reversed by the North Carolina Court of Appeals. On certiorari the United States Supreme Court affirmed the Supreme Court of North Carolina.

In so doing, the court acknowledged its holding in *Hanna Mining, supra,* that state acts constituting " 'limitations on supervisory organizing' " could validly "be applied to activity by a union of supervisors." (416 U.S. at p. 657 [40 L.Ed.2d at p. 448].) It held, however, that the North Carolina law in question, by denying the employer the right of "self help," "would plainly put pressure on respondent" and thereby "flout the national policy against compulsion upon employers from either federal or state agencies to treat supervisors as employees." (*Supra* at p. 662 [40 L.Ed.2d at p. 451].)

The national policy thus referred to is also variously described in the opinion as being (1) " 'to relieve employers from any compulsion under the Act and under state law to countenance or bargain with any union of supervisory employees' " (*supra* at p. 657 [40 L.Ed.2d at p. 448]), (2) that "[e]mployers were not to be obliged to recognize and bargain with unions including or composed of supervisors" (*supra* at p. 659 [40 L.Ed.2d at p. 449]), and (3) that of "relieving the employer of obligations . . . 'to accord to the front line of management the anomalous status of employees' " (*supra* at p. 662 [40 L.Ed.2d at pp. 450-451]). Though differently stated, all these expressions of the policy have the same meaning; the national policy is against placing employers under any compulsion under the act and under state law to recognize or bargain with any union of supervisory employees.

The holding of *Beasley,* therefore, is that section 14(a) has the effect of prohibiting state regulations that place the employer under any compulsion to recognize or bargain with any union of supervisory employees, whether that compulsion is applied directly by what our Supreme Court referred to in *Safeway Stores* as "labor relations acts" or indirectly by prohibiting what the North Carolina Supreme Court characterized as the "weapon of self-help to the employer."

The reasons which invalidated the state statute in *Beasley* have no application to the case at bar. We are not dealing with any matter involving employers being subjected to compulsion under state law to recognize or bargain with any union of supervisory employees, nor compulsion upon employers from state agencies to treat supervisors as employees. The collective bargaining agreement between PGA and AMPTP was entered into without any compulsion either from the law of this state or any state agency, since the law of this state does not require employers to bargain with any union. Said agreement treats producers as employees because the employers voluntarily chose to do so. Moreover, we are not dealing with any limitation upon employers' self-help. We are, instead, dealing with

"state limitations on supervisory organizing" which the *Beasley* court acknowledges as proper. When this state's policy that labor organizations acting as collective bargaining agents must remain free of that divided loyalty inherent in their being dominated or controlled by employers is enforced against a union of supervisory employees, it is a state limitation on supervisory organizing. The policy is therefore properly applicable to defendant PGA.

### The Uncontradicted Facts Establish Interference, Domination and Control of PGA by Employer Representatives

The uncontradicted facts showing that the overwhelming majority of all PGA officials having any power or authority with respect to the negotiation of the collective bargaining agreement were "employer-producers," establish as a matter of law that PGA was "interfered with or dominated or controlled" by employers within the meaning of sections 923 and 1122 of the Labor Code. PGA was a nonprofit corporation. Like any other corporation, it could only act in respect of such negotiations through its duly constituted officers and members of its negotiating committee, pursuant to the authority and under the control of its board of directors. Since employer representatives constituted a majority of its board of directors, all of its activities in relation to the negotiations were under the general control of such representatives. The resolution of each detail in the negotiation was similarly under the control of employer representatives by virtue of their occupying 10 of the 13 places on the negotiating committee.

The impropriety of any such relationship between employer representatives and the PGA was made clear by the aforementioned opinion of our Supreme Court in *Safeway Stores* v. *Retail Clerks etc. Assn., supra,* 41 Cal.2d 567, 575. There, the court, in stating the reasons why it was not a legitimate objective of the clerks' union to force Safeway stores' managers into the clerks' union, said the following: ". . . Under the law an employer may not demand that his representatives *sit in the inner councils of labor* and thus be placed in the position of exerting his influence in directing labor's policies and activities. *If such an objective were recognized and were accomplished collective bargaining would be in confusion and indeed futile.* By the same token an employee union may not insist that a representative of the employer be required to participate in its deliberations under union rules and thus divide his loyalty." (Italics added.) Employers and their representatives may not "sit in the inner councils of labor" because were they to do so their divided loyalty would render collective bargaining "futile."

Further support for this conclusion is found in the federal authorities construing and applying section 8(a) of the federal Labor Management Relations Act. The operative language of section 1122 of the Labor Code, like that of section 1117, is substantially identical to the operative language contained in section 8(a)(2) of the federal act (29 U.S.C. § 158(a)(2)), which provides that "it shall be an unfair labor practice for an employer— . . . to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it." The California Supreme Court decisions, holding that the authorities under section 8(a)(2) are persuasive with respect to the interpretation of Labor Code section 1117 are, therefore, equally applicable to the interpretation of section 1122 of the Labor Code.

In *Englund* v. *Chavez, supra,* 8 Cal.3d 572, 589-590 [105 Cal.Rptr. 521, 504 P.2d 457], our Supreme Court justified reference to the federal authorities in the following language: ". . . In light of the similar language and purposes of the state and federal provisions, this court has long recognized that '[f]ederal decisions construing section 8(a) . . . (2) . . . are persuasive in interpreting section 1117 . . . .' (*Petri Cleaners, Inc.* v. *Automotive Employees, etc., Local No. 88* (1960) 53 Cal.2d 455, 459 [2 Cal.Rptr. 470, 349 P.2d 76]; see *Sommer* v. *Metal Trades Council* (1953) 40 Cal.2d 392, 400 [254 P.2d 559].)"

The federal decisions are too numerous to permit extensive discussion of any but the most apposite.

In *Virginia Ferry Corp.* v. *National Labor Relations Bd.* (4th Cir. 1939) 101 F.2d 103, the court held that participation of tugboat captains in negotiations with the employer, as to wages and working conditions of their crews, was a violation of section 8(a), saying, at page 105: "The employer cannot be permitted, directly or indirectly, to sit on both sides of the bargaining table."

The Court of Appeals for the District of Columbia reached a similar result in *Local 636, etc. Plumbing & Pipe Fit. Ind. of U.S.* v. *N.L.R.B.* (1961) 287 F.2d 354 [109 App.D.C. 315]. In that case the court was reviewing a cease and desist order issued by the National Labor Relations Board, based upon its finding that participation of certain employer representatives in the internal affairs of the local constituted violations of section 8(a). A variety of such employer representatives was involved. One of them, a general foreman of pipefitters, was president of the local, and others, with similar supervisory functions, were members of the executive board.

All parties conceded "that the supervisors, in their intra-union activities, at all times acted in what they considered in complete good faith to be the best interests of the union." Nonetheless, the court said (287 F.2d at p. 361): "We think that active participation in union affairs by supervisors was aptly characterized as 'interference' by the Board. We also agreed with the Board in charging the interference thus found to the respondent employers. 'The policy of the Act is to insulate employees' jobs from their organizational rights.' Radio Officers' Union, supra, 347 U.S. at page 40, 74 S.Ct. at page 335. 'We are dealing here . . . with a clear legislative policy to free the collective bargaining process from all taint of an employer's . . . influence.' Machinists, supra, 311 U.S. at page 80, 61 S.Ct. at page 88."

*Mon River Towing, Inc.* v. *N.L.R.B.* (3d Cir. 1969) 421 F.2d 1, is the most recent case of this character. A United Mine Workers local became the certified representative elected by four classifications of employees of the towing company. When the occasion arose to negotiate a new contract, the union's negotiating committee, elected by the membership, included one representative from each classification. That meant that one of the four was a tugboat captain who exercised supervision over employees of other classes. The N.L.R.B. order declared that the participation of the boat captain on the negotiating committee constituted a violation of section 8(a)(1) and (2). Partly on this basis, the Board ordered the employer to refrain from giving effect to the contract. The court affirmed the N.L.R.B. order in all respects. In so doing, it quoted with approval a statement from the N.L.R.B. decision in *Nassau and Suffolk Contractors' Association, Inc.* (1957) 118 N.L.R.B. 174, 187, as follows: "[W]e do believe that it is improper for supervisors, even those with predominantly union loyalty to serve as negotiating representatives of employees; and to the extent that the employer acquiesces in such participation the employer is guilty of unlawful *interference* with the administration of the Union. . . . [T]he mechanics remain in part agents of their employers with a resulting divided loyalty and interests. . . . *Employees have the right to be represented in collective bargaining negotiations by individuals who have a single-minded loyalty to their interests.* Conversely, an employer is under a duty to refrain from any action which will interfere with that employee right and place him in even slight degree on both sides of the bargaining table. (Emphasis by Board.)" (421 F.2d at p. 7.)

In numerous other proceedings the National Labor Relations Board has, on similar grounds, excluded from various bargaining units of nonsupervisory employees anyone who, for any reason, is in a position to have "an effective voice in the formulation and determination of corporate [*i.e.,* the

employer's] policy." (*Red and White Airway Cab Co.* (1959) 123 N.L.R.B. 83, 85.) Examples in which the basis of the exclusion was the ownership of a proprietary interest in the employer include *Red and White Airway Cab Co., supra; Sida of Hawaii, Inc.* (1971) 191 N.L.R.B. 194; *Anchorage Businessmen's Association, Drugstore Unit* (1959) 124 N.L.R.B. 662; and *Thos. & Geo. M. Stone, Inc.* (1958) 120 N.L.R.B. 480.

The foregoing federal authorities, of course, go much further than necessary to dispose of the issue in this case, and by citing them this court does not necessarily adopt each of their particular holdings as applicable to the participation of "employer-producers" as members of defendant PGA. The general principle they adopt is, however, fully applicable. That principle is that the union leadership responsible for dealing with the employer must have "single-minded loyalty" to the employee's side of the collective bargaining equation.

Defendants' argument that a rule denying the "employer-producers" full participation in union affairs would be contrary to the holdings of the California courts in *Messner* v. *Journeymen Barbers, etc.,* 53 Cal.2d 873 [4 Cal.Rptr. 179, 351 P.2d 347], and *Riviello* v. *Journeymen Barbers etc. Union,* 88 Cal.App.2d 499 [199 P.2d 400], need not detain us long. There is no issue in this case relating to any "owner-producers" being required to become "sterile members." All that was held in *Messner* and *Riviello* was that unless equal *membership* rights were offered to the so-called "businessman-workers" the barbers' union was attempting to force into their union, picketing for the purpose of requiring them to join the union was not in furtherance of a legitimate labor objective. No picketing or other concerted activity of any kind designed to force the "employer-producers" into the Guild is here involved. At present they are voluntary members. If they desire to continue as such, they will be obliged to accept a less active role.

This court does not have a basis upon which to define the role which "employer-producers" might legitimately undertake, though some guidelines are suggested by the authorities discussed above. In *Mon River Towing, Inc., supra,* it was pointed out that it was not necessary that the captains actively participate in order to enjoy benefits of union membership. The court said in this respect: "Second, it is not as clear as Mon River asserts that in order to protect the interests of its boat captains it is necessary that they actively participate in union affairs. To the extent that the interests of the captains are identical with those of rank-and-file employees, negotiations by such employees alone would seem to afford the captains all the protection they need. On the other hand, if negotiation

on their own behalf is essential to adequately protect the captains, nothing prevents Mon River from negotiating a separate contract with them." (Fn. omitted.) (421 F.2d at p. 7.) Voting by union members having an ownership interest in their employer has been considered in several N.L.R.B. cases. Some of these suggest that its propriety depends on whether their numbers are sufficient to give them an effective voice in the formulation of policy. (*Red and White Airway Cab Co., supra,* 123 N.L.R.B. 83; *Sida of Hawaii, Inc., supra,* 191 N.L.R.B. 194.)

It is, therefore, clear that under the facts, in respect of which there was no dispute, defendant PGA was at all times relevant to the negotiation of the collective bargaining agreement a labor organization which was "interfered with or dominated or controlled by an employer." Pursuant to Code of Civil Procedure section 909, this court so finds.

### *The Collective Bargaining Agreement Was Invalidated by the Employer Interference, Domination and Control*

Sections 923 and 1122 of the Labor Code declare the public policy of this state relating to the important objective of attempting "to balance the industrial equation, so far as it is possible to do so, by placing employer and employee on an equal basis." (*Shafer* v. *Registered Pharmacists Union,* 16 Cal.2d 379, 385 [106 P.2d 403].) A contract, executed in contravention of so significant a policy, is plainly invalid and unenforceable.

Referring to section 923 of the Labor Code, the First Appellate District, Division One, in *Holayter* v. *Smith,* 29 Cal.App.3d 326, 333 [104 Cal. Rptr. 745], stated as follows (citing *Chavez* v. *Sargent, supra,* 52 Cal.2d 162, 191 [339 P.2d 801]): "This policy is applicable to the right of enforcement of collective bargaining contracts."

The invalidation of purported collective bargaining agreements, negotiated in violation of the policy therein expressed, is an important function of sections 923 and 1122 of the Labor Code. Such a contract constitutes a serious impediment to the workman's "full freedom of association, self-organization, and designation of representatives" (§ 923) so long as it remains in effect. Any collective bargaining agreement, recognizing a particular labor organization as exclusive bargaining agent for an employee group and containing union shop provisions, necessarily interferes with the freedom of prospective employees of the employers signatory thereto to effectively organize and choose another representative.

Though our decision to invalidate it is not based upon acceptance of appellants' contention that the agreement between PGA and AMPTP is

so deficient in its provision of employee benefits as to constitute no collective bargaining agreement at all,[14] the modest benefits it bestows, in comparison with the restrictions it imposes upon "employee-producers" desiring to negotiate the terms and conditions of their employment through representatives of their own choosing, serves to emphasize the importance of eliminating it. Most of the matters traditionally dealt with by collective bargaining are thereby insulated from the effects of collective bargaining. For its full 10-year term all other collective bargaining agents are excluded, and PGA is foreclosed from requiring the employers "to bargain on any terms or conditions relating to employment, including those covered herein." Virtually the only conditions of employment "covered" in the contract are those relating to guild shop, the health and welfare plan and the pension, though the evidence clearly showed the desire on the part of producers to act collectively in regard to such usual employee benefits as minimum compensation, residuals and credits customarily sought in Guild contracts in the motion picture and television industry.

It is no answer to say that there can be no assurance the producers would have succeeded in obtaining any greater employee benefits if the Guild had not been influenced or dominated by "employer-producers." This may be true; but it is also true that " 'it is manifestly impossible to say that greater benefits might not have been secured if the freedom of choice of a bargaining agent had not been interfered with.' [Citations.]" (*Virginia Electric Co.* v. *Board* (1943) 319 U.S. 533, 544 [87 L.Ed. 1568, 1576, 63 S.Ct. 1214].)

The fact that the membership of the PGA voted 160 to 2 to ratify the agreement likewise does not lend any support to its validity. The individual right to reject an unsatisfactory agreement is no substitute for negotiations conducted by a collective bargaining representative with "single-minded loyalty" to the employees' objectives.

Our conclusion that the contract must be declared invalid is in accord with the decision of the Court of Appeals of the Third Circuit in *Mon River Towing, Inc.* v. *N.L.R.B., supra,* 421 F.2d 1, where the board's

---

[14]It is unnecessary, in view of our finding of invalidity based upon the interference and domination, to resolve the issue raised by the contention of appellants that the collective bargaining agreement as executed is so deficient in its provision for employee benefits as to constitute no collective bargaining agreement at all. We observe in this connection that the non-interventionist policy of this state with respect to collective bargaining leaves the content of such agreements to the results of negotiation based upon the respective bargaining power of the negotiating parties. If the bargaining power of "employee-producers" does not justify any greater benefits, there is no reason they could not, through a collective bargaining agent of their choice which is not dominated or influenced by employers, accept the best terms obtainable.

order requiring the employer to "refrain from giving effect to the contract" was affirmed. In respect to this matter, the court said, at page 4: ". . . The last requirement is particularly important because it would eliminate the contract as a barrier to new representation proceedings."

There is no basis at this time to adjudicate or declare that defendant PGA is not a "bona fide labor organization." This is a term used by appellants to describe a "labor organization" qualifying as such under section 1117 of the Labor Code.[15] Unlike section 1122, section 1117 deals solely with the matter of determining when a strike constitutes a jurisdictional strike. A jurisdictional strike is defined in section 1118 as a strike "arising out of a controversy between two or more labor organizations." Section 1117 is, therefore, pertinent only where there are at least two labor organizations and there is a strike arising out of a controversy between them.

There was no strike, jurisdictional or otherwise, calling for a determination of defendant PGA's status as a "labor organization." Our finding that it was a labor organization interfered with, dominated or controlled by employers is, therefore, not a holding that it was not or is not a "labor organization" within the meaning of the Jurisdictional Strike Act. Moreover, it leaves entirely open PGA's present or possible future status as an effective collective bargaining representative for any or all of the producers who may wish to be represented by it. There is nothing in the record to suggest that if defendant PGA has freed itself, or in the future does free itself, of the employer domination which was shown by the uncontradicted evidence, valid negotiations looking toward a new collective bargaining agreement could not be conducted by it.

We also express no opinion with respect to the effect of the invalidity of the collective bargaining agreement, on the grounds above stated, upon contributions already made to the health and welfare fund and to the pension plan. The adjudication of any such matters obviously would require the presence of parties who are not before the court.

The judgment is reversed, and the superior court is directed to enter its judgment, declaring as between the plaintiffs and the cross-defendant Writers Guild of America, West, Inc., and the defendants, that the collective bargaining agreement, attached to the complaint as exhibit 1 and received in evidence as plaintiffs' exhibit 1, is void and unenforceable

---

[15]The section as enacted does not use the words "bona fide," though in one of its permutations prior to enactment it did. (See *Englund* v. *Chavez, supra,* 8 Cal.3d 572, 588-589, fn. 8.)

and of no further force or effect, and awarding plaintiffs and cross-defendant costs. The judgment shall otherwise deny all relief to the parties or any of them.

Allport, Acting P. J., and Cobey, J., concurred.

A petition for a rehearing was denied July 11, 1974, and the petitions of all the respondents for a hearing by the Supreme Court were denied August 28, 1974. Mosk, J., was of the opinion that the petitions should be granted.